# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ARTHUR FLOOD, Individually and on behalf of all others similarly situated, | § § § § | No. 101, 2018 |
| Plaintiff Below, Appellant, | § § § § | Court Below: Court of Chancery of the State of Delaware |
| v. | § § § | C.A. No. 2017-0032-JTL |
| SYNUTRA INTERNATIONAL, INC., LIANG ZHANG, JINRONG CHEN, LEI LIN, YALIN WU, XIUQING MENG, BEAMS POWER MERGER SUB LIMITED, and HOULIHAN LOKEY CAPITAL, INC., | § § § § § § § § § | |
| Defendants Below, Appellee. | § § | |

Submitted: September 12, 2018
Decided: October 9, 2018

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, **SEITZ**, and **TRAYNOR**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **AFFIRMED**.

Ryan M. Ernst, Esquire, Daniel P. Murray, Esquire, O'Kelly Ernst & Joyce, LLC, Wilmington, Delaware; Donald J. Enright, Esquire (*Argued*), Elizabeth K. Tripodi, Esquire, Levi & Korsinsky, LLP, Washington, D.C., *for Appellant, Arthur Flood*.

Matthew E. Fischer, Esquire, Matthew R. Dreyfuss, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware; Roger A. Cooper, Esquire, Rishi N. Zutshi, Esquire (*Argued*), Vanessa C. Richardson, Esquire, Hana Choi, Esquire, Cleary Gottlieb Steen & Hamilton LLP, New York, New York, *for Appellees, Synutra International, Inc, Jinrong Chen, Lei Lin, and Yalin Wu*.

William M. Lafferty, Esquire, John P. DiTomo, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Lawrence Portnoy, Esquire, Rebecca L. Martin, Esquire, Davis Polk & Wardwell LLP, New York, New York, *for Appellees, Liang Zhang, Xiuqing Meng, and Beams Power Investment Ltd.*

**STRINE**, Chief Justice, for the Majority:

In *Kahn v. M&F Worldwide Corp.* ("*MFW*"),[1] we held that business judgment review applied to a merger proposed by a controlling stockholder conditioned before the start of negotiations on "both the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; and the uncoerced, informed vote of a majority of the minority stockholders."[2] In this appeal, the question is whether the Court of Chancery properly applied *MFW* by reading it as: i) allowing for the application of the business judgment rule if the controlling stockholder conditions its bid on both of the key procedural protections at the beginning stages of the process of considering a going private proposal and before any economic negotiations commence, and ii) requiring the Court of Chancery to apply traditional principles of due care and to hold that no litigable question of due care exists if the complaint fails to allege that an independent special committee acted with gross negligence. In our previous affirmance of the Court of Chancery in *Swomley v. Schlecht*,[3] we held that an interpretation of *MFW* based on these principles was correct.

As to the first point, what is critical for the application of the business judgment rule is that the controller accept that no transaction goes forward without special committee and disinterested stockholder approval early in the process and

---

[1] 88 A.3d 635 (Del. 2014).
[2] *Id.* at 644
[3] 128 A.3d 992 (Del. 2015) (TABLE).

before there has been any economic horse trading. Stressing that in the controller's first expression of interest it failed to condition its proposal on the satisfaction of those two key conditions, the plaintiff ignores that the controller quickly conditioned its offer on both of *MFW*'s dual requirements — approval by an independent Special Committee and an affirmative vote by a majority of the minority stockholders — before the Special Committee had even hired counsel. *MFW*'s required preconditions were therefore in place before any economic negotiation between the Special Committee and the controller occurred. Thus, before the Special Committee began substantive deliberations, it knew that any merger was conditioned on both its approval and the approval of a majority of the disinterested stockholders. So, consistent with our prior decision to identical effect in *Swomley*,[4] we therefore agree with the Court of Chancery that *MFW* applies "when the controller announces the conditions 'before any negotiations took place.'"[5]

As to the second point, the central objective of the *MFW* standard is to provide an incentive for controllers to embrace the procedural approach most favorable to minority investors, with the incentive of obtaining the protection of the business

---

[4] *Swomley*, 2014 WL 4470947, at *21, *aff'd* 128 A.3d 992 (Del. 2015) (TABLE) (holding that *MFW* applied despite the fact that "the controller's initial proposal hedged on whether the majority-of-the-minority condition would be waivable or not, but from the first meeting, the board resolved that any deal would require both the approval of a special committee and a majority-of-the-minority vote").

[5] *In re Synutra Int'l, Inc.*, No. 2017-0032-JTL, 2018 WL 705702, at *2 (Del. Ch. Feb. 2, 2017) (quoting *Swomley*, 2014 WL 4470947, at *17–18).

judgment rule standard of review. To lard on to the due care review a substantive review of the economic fairness of the deal approved by a Special Committee, as the plaintiff advocates, is to import improperly into a due care analysis the type of scrutiny used in entire fairness review and in appraisal cases. Thus, in *Swomley* and in this case, the Court of Chancery properly held that the business judgment rule applied when the other conditions of *MFW* applied and the Special Committee employed qualified legal and financial advisors and indisputably engaged in a deliberative process that cannot rationally be characterized as grossly negligent.[6]

Accordingly, we affirm.

## I.

This case comes before us from a dismissal of the plaintiff's complaint by the Court of Chancery.[7] The relevant pled facts can be summarized briefly. Liang Zhang and entities related to him controlled 63.5% of Synutra International Inc.'s stock.[8] In January 2016, Zhang proposed to take Synutra private by acquiring the rest of the stock he did not control.[9] In an initial letter, Zhang proposed purchasing

---

[6] *See Swomley*, 2014 WL 4470947, at *21, *aff'd* 128 A.3d 992 (Del. 2015) (TABLE) (holding that the "gross negligence standard," a standard that "is only satisfied by conduct that really requires recklessness," applies to whether the Special Committee "met its duty of care in negotiating a fair price" and that merely alleging that "[s]omebody could have negotiated that differently" does not establish a duty of care violation to overcome a motion to dismiss).

[7] Accordingly, we review whether the Court of Chancery's decision was correct *de novo*. *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 438–39 (Del. 2005).

[8] Opening Br. at 1.

[9] *Id.* at 5.

the remaining shares at $5.91, but he did not include a requirement that the sale be conditioned on the approval of a special committee and an affirmative vote of a majority of the minority stockholders.[10] To assist him in the proposed merger, Zhang retained Davis Polk & Wardwell LLP.[11] Although Davis Polk was traditionally Synutra's corporate counsel, Synutra's CFO agreed to waive Davis Polk's conflicts of interest before the Board met to discuss Zhang's proposed merger.[12]

One week after Zhang issued his proposal, the Board met and formed a Special Committee.[13] Before the meeting, the Board "agreed that it would not substantively evaluate" Zhang's proposal.[14] Although Davis Polk now represented Zhang, it advised the Board at this meeting on its fiduciary duties.[15] The Board understood that Davis Polk represented Zhang, but nevertheless "requested the attendance . . . of representatives of Davis Polk who frequently advised [the Board] because those representatives were not involved in Davis Polk's representation of [Zhang]."[16] The

---

[10] *Id.*; App. to Opening Br. at A22 (Verified Amended Class Action Complaint (Feb. 10, 2017)) ("As clearly evidenced by the Initial Proposal quoted in full above, Zhang did not condition the Proposed Buyout *ab initio* on approval by a special committee nor on approval by the majority of the minority unaffiliated stockholders.").

[11] Opening Br. at 5 ("By the time of [the first] meeting, [Zhang] had already retained Davis Polk as legal counsel in connection with the Buyout.").

[12] *Id.*

[13] *Id.* at 5–6.

[14] App. to Opening Br. at A152 (Schedule 14A, Definitive Proxy Statement, Synutra International, Inc. (Mar. 9, 2017)).

[15] Opening Br. at 5–6.

[16] App. to Opening Br. at A152 (Schedule 14A, Definitive Proxy Statement, Synutra International, Inc. (Mar. 9, 2017)).

plaintiff does not allege that any negotiations occurred at this meeting.[17] Rather, the only substantive action the plaintiff alleges was taken at the meeting was the decision to establish the Special Committee.[18] Indeed, the proxy, which plaintiff incorporated into his complaint by reference, says that the Board did not discuss the substance of Zhang's proposal at the meeting.[19] Specifically, the proxy states that, at the January 21, 2016 board meeting, the "board of directors agreed that it would not substantively evaluate the January 14 Proposal at this meeting and that Davis Polk's advice to [the] board of directors would be limited to reminding the directors of their fiduciary duties under Delaware law and advising [the] board of directors on establishing a special committee to evaluate and, if appropriate, negotiate the January 14 Proposal."[20] The plaintiff pleads no facts to the contrary.

Two weeks after the initial offer, and only one week after the Special Committee was formed, Zhang sent a second letter to the Special Committee stipulating that he would not proceed with the transaction unless it was approved by the Special Committee and approved by the holders of a majority of the voting stock not controlled by Zhang.[21] No negotiations had commenced as of that time; the

---

[17] *Id.* at A63–65 (Verified Amended Class Action Complaint (Feb. 10, 2017)) (noting that the Board met, formed a Special Committee, and then, two weeks later, Zhang made his second proposal without alleging any discussions or interactions during that two-week period).

[18] *Id.* (Verified Amended Class Action Complaint (Feb. 10, 2017)).

[19] *Id.* at A152 (Schedule 14A, Definitive Proxy Statement, Synutra International, Inc. (Mar. 9, 2017)).

[20] *Id.* (Schedule 14A, Definitive Proxy Statement, Synutra International, Inc. (Mar. 9, 2017)).

[21] Opening Br. at 7.

Special Committee had not met and the complaint is devoid of any facts suggesting that the Special Committee and Zhang had engaged in any economic negotiations.[22] In fact, the plaintiff's complaint makes clear that:

- the Special Committee did not engage its own investment bank or counsel until after this point;[23]

- the Special Committee declined to engage in price negotiations until its banker could do due diligence and obtain projections;[24] and

- the price negotiations did not begin until seven months after Zhang's second offer conditioning any merger on both Special Committee and majority-of-the-minority approval.[25]

Thus, the plaintiff does not allege any negotiations or other meetings occurred before Zhang's second offer, which conditioned the take-private offer on *MFW*'s dual requirements.

To highlight this reality, it is useful to underscore the chronology of the facts the complaint outlines. After receiving Zhang's second offer — proposing the same price as the first offer — on January 30, 2016, the Special Committee hired Houlihan Lokey and Cleary Gottlieb as its independent financial and legal advisors.[26] Houlihan began discussions with management regarding the company's financial

---

[22] *See* App. to Opening Br. at A46–90 (Verified Amended Class Action Complaint (Feb. 10, 2017)).

[23] *Id.* at A152–53 (Schedule 14A, Definitive Proxy Statement, Synutra International, Inc. (Mar. 9, 2017)).

[24] *Id.* at A64–80 (Verified Amended Class Action Complaint (Feb. 10, 2017)).

[25] *Id.* at A60–67.

[26] *Id.* at A64–67.

6

projections. On March 22, 2016, Houlihan met with the company's CFO to discuss what was needed for Houlihan to advise the Special Committee.[27] The next day, the Special Committee met, received an update from Houlihan, and discussed Davis Polk's preparations of an initial draft of the merger agreement.[28] Houlihan received the company's financial projections on April 22, 2016, met with the company's management on April 28, 2016 to discuss the projections, and provided the Special Committee with "preliminary financial discussion materials" on June 3, 2016.[29]

The Special Committee met again on July 20, 2016 and decided to have Houlihan initiate a market check.[30] None of the 25 potential bidders Houlihan contacted were interested, which is not surprising given Zhang's 63.5% voting control and the lack of any promise that he was a willing seller.[31]

In August 2016, management provided Houlhian with updated, lower projections.[32] Houlihan provided an updated financial analysis to the Special Committee on September 8, 2016.[33] At that meeting, after seven months of analysis and consultation with its advisors, the Special Committee authorized Houlihan to negotiate a higher price with Zhang.[34] The next day, Houlihan met with Zhang, and

---

[27] *Id.* at A66.
[28] *Id.* at A66–67.
[29] *Id.* at A68–69.
[30] *Id.* at A70–71.
[31] *Id.* at A71.
[32] *Id.* at A71–72.
[33] *Id.* at A73–74.
[34] *Id.*.

Zhang agreed to increase his offer to $6.05 per share.[35] The Special Committee met again on September 22, 2016 and ultimately agreed to accept the $6.05 price, a 2.4% bump from Zhang's original offer, a 58% premium to the trading price of Synutra's stock when the offer was first made public, a 31% and 20% premium to the 30- and 60-day volume-weighted trading averages, respectively, and a price that Houlihan viewed as fair.[36]

The plaintiff argues that this price was not fair. But, the plaintiff fails to allege any lack of independence on the part of the Special Committee,[37] and admits that the Special Committee met 15 times over a nine-month period and was advised by independent financial, legal, and economic advisors.[38] At bottom, the plaintiff just takes issue with the economic outcome of the negotiation and questions how skillful the Special Committee and its advisors were.[39] The plaintiff does not allege that the

---

[35] *Id.* at A74–75.

[36] *Id.* at A167 (Schedule 14A, Definitive Proxy Statement, Synutra International, Inc. (Mar. 9, 2017)).

[37] Although the plaintiff makes some noise about Yalin Wu — a member of the Special Committee who was appointed to the Board at the Board meeting in which the Board formed the Special Committee — the Court of Chancery correctly found that a "charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election" does not rebut the presumption of director independence. *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984).

[38] App. to Opening Br. at A64–79 (Verified Amended Class Action Complaint (Feb. 10, 2017)); *id.* at A151–167 (Schedule 14A, Definitive Proxy Statement, Synutra International, Inc. (Mar. 9, 2017)).

[39] Opening Br. at 25 ("The Complaint alleged strikingly similar facts, demonstrating not only that the price was insufficient, but therefore, that the Special Committee was grossly negligent.").

8

majority-of-the-minority vote secured to approve the merger was coerced or not fully informed.[40]

## II.

In this appeal, the plaintiff does not quibble with the *MFW* standard itself, but argues that the Court of Chancery misapplied it in two respects. Despite the fact that the controlling stockholder here conditioned his second offer on approval by the Special Committee and an affirmative majority-of-the-minority vote before any substantive economic negotiations occurred between himself and the Special Committee, the plaintiff argues that, because Zhang's initial offer letter did not contain the Special Committee approval and majority-of-the-minority vote conditions, the business judgment rule does not apply.[41] In the plaintiff's view, if a controller's first approach does not contain the required conditions, then it is stuck with entire fairness review, even if the controller still commits itself to *MFW*'s requirements early on before any economic negotiations.[42]

The plaintiff grounds its argument in the language of our opinion in *MFW* that says both procedural protections must be in place "*ab initio*"[43] (Latin for "from the

---

[40] *See* App. to Opening Br. at A46–90 (Verified Amended Class Action Complaint (Feb. 10, 2017)).

[41] Opening Br. at 19 ([I]n a controlling stockholder squeeze-out merger, negotiations begin at the initial offer, and a control must self-disable at that point if it is to receive the benefits of the business judgment rule.").

[42] *Id.*

[43] *MFW*, 88 A.3d at 646.

9

beginning"[44]), and in language from the Court of Chancery's decision in *MFW* that uses the phrase "[f]rom inception."[45] The plaintiff argues for a quite specific and exacting reading of that language. Rather than meaning that the conditions be in place at the beginning of the Special Committee's process and before economic bargaining occurs, the plaintiff argues that it means that the controller must include the conditions in its "first offer" or else lose out on the business judgment rule.[46] The plaintiff argues for the brightest of lines.[47]

The defendants read the requirement that the conditions be in place "*ab initio*" or "from inception" less rigidly. They argue that what *MFW* requires is that these conditions be in place at the early stages of negotiations, and that they be in place before any substantive economic negotiations take place, so that the proffer of the conditions cannot be substituted for price concessions.[48]

Below, the Court of Chancery sided with the defendants' view, stating "[a] process meets the *ab initio* requirement when the controller announces the

---

[44] AB INITIO, Black's Law Dictionary (10th ed. 2014).
[45] *In re MFW*, 67 A.3d at 529.
[46] Opening Br. at 18 ("Thus, the outset — the *initio* — of negotiations must tautologically be the first offer. Any other interpretation simply does not comport with the underlying concepts.").
[47] *Id.* (suggesting that "negotiations commence with the initial proposal") (emphasis omitted).
[48] Answering Br. at 19–20 (Moreover, despite Plaintiff's contention that the 'clear implication' or [*MFW*'s] *ab initio* requirement is that 'negotiations begin at the initial offer,' neither this Court nor any other has adopted such a rule.") (citation omitted).

10

conditions 'before any negotiations took place.'"[49]   As we did in our previous

decision in *Swomley*, we read *MFW* as the Court of Chancery did here.

Admittedly, our opinion and the Court of Chancery's opinion in *MFW* uses

what can be read as ambiguous language to express the requirement that the key dual

procedural protections must be in place before economic negotiations so the

protections are not used as a bargaining tool in substitution for economic concessions

by the controller.   In describing this prerequisite to the invocation of the business

judgment rule standard of review, we and the Court of Chancery have said the

conditions must be in place "*ab initio*,"[50] before the "procession of the transaction,"[51]

"from inception,"[52] "from the time of the controller's first overture,"[53] and

"upfront."[54]   From these uses, the plaintiff argues that *MFW* strictly hinges the

---

[49] *In re Synutra*, 2018 WL 705702, at *2 (quoting *Swomley*, 2014 WL 4470947, at *17–18).

[50] *MFW*, 88 A.3d at 646 ("We hold that business judgment is the standard of review that should govern mergers between a controlling stockholder and its corporate subsidiary, where the merger is conditioned *ab initio* upon both the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; and the uncoerced, informed vote of a majority of the minority stockholders.").

[51] *Id.* at 645 ("To summarize our holding, in controller buyouts, the business judgment standard of review will be applied if and only if: (i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority shareholders . . ."); *see also In re MFW*, 67 A.3d at 535 ("The business judgment rule is only invoked if: (i) the controller conditions the procession of the transaction on the approval of both a special committee and a majority of the minority stockholders . . .").

[52] *In re MFW*, 67 A.3d at 528 ("From inception, the controlling stockholder knows that it cannot bypass the special committee's ability to say no.").

[53] *Id.* at 503 ("[T]he court concludes that when a controlling stockholder merger has, from the time of the controller's first overture, been subject to . . .").

[54] *Id.* at 505 ("After addressing that issue, the court then considers whether our Supreme Court has answered the question of what judicial standard of review applies to a merger with a controlling stockholder conditioned upfront on a promise that no transaction will proceed without (i) special committee approval, and (ii) the affirmative vote of a majority of the minority stockholders.

11

application of the business judgment rule on the controller including the two key procedural protections in the first offer. A controller gets one chance, as the master of its offer, to take advantage of *MFW*, and if it fails to do so, that is it. But in an earlier case, the Court of Chancery and we did not embrace this rigid reading of *MFW*. In the case of *Swomley v. Schlecht*, the Court of Chancery held that *MFW*'s "*ab initio*" requirement was satisfied even though "the controller's initial proposal hedged on whether the majority-of-the-minority condition would be waivable or not" because the controller conditioned the merger on both of *MFW*'s dual requirements "before any negotiations took place."[55] We affirmed that well-reasoned conclusion, and adhere to that approach for reasons we now explain.

For starters, the plaintiff's cramped reading contradicts the use of "beginning" in everyday speech, when that term is applied to a multi-stage process of human events with periods of time leading to an ultimate conclusion.[56] A goal scored in the fifth minute of a 90-minute game would be referred to as a goal at the beginning of the match. Enjoying the beginning of fall refers to those few weeks in late September and early October when the weather gets chilly and the leaves start to change color, not just the autumnal equinox. The beginning of a novel is not the

---

Finally, having concluded that the question has not been answered by our Supreme Court, this court answers the question itself.").

[55] *Swomley*, 2014 WL 4470947, at *17–18.

[56] For instance, Merriam-Webster defines beginning as "the first part" or "a rudimentary stage or early period." Beginning, Merriam-Webster, https://www.merriam-webster.com/dictionary/beginning.

first word, but the first few chapters that introduce the reader to the characters, setting, and plot. Indeed, three years after Britain entered World War II,[57] Winston Churchill famously declared that the War had reached "the end of the beginning."[58]

Thus, as a matter of language, "from the beginning" can encompass more than the narrow sense in which the plaintiff reads those words. An ordinary person would conclude that Zhang had conditioned the merger on *MFW*'s dual requirements in the beginning stages of the process that led to the merger. More important, even if the plaintiff's linguistic argument is one plausible reading of the literal words of *MFW*, that reading is at odds with the origins of why that decision requires that the controller condition its offer early in the process — i.e., before any substantive economic negotiations begin — on the two key procedural protections.

The *MFW* standard emerged out of concerns created by *Kahn v. Lynch Communication Systems, Inc.*, which held that approval of a controlling shareholder transaction by either "an independent committee of directors or an informed majority of minority shareholders shifts the burden of proof on the issue of [entire] fairness from the controlling or dominating shareholder to the challenging shareholder-plaintiff."[59] *Lynch* incentivized "the use of special negotiating committees in

---

[57] Britain declared war on Germany on September 3, 1939.

[58] Winston Churchill, *The End of the Beginning* (Churchill Society, Nov. 10, 1942), http://www.churchill-society-london.org.uk/EndoBegn.html.

[59] 638 A.2d 1110, 1117 (Del. 1994).

addressing mergers with controlling stockholders," but its practical effect "in the real world of transactions was to generate the use of special committees alone."[60] Controllers were reluctant to condition mergers on a majority-of-the-minority vote upfront because it "added an element of transactional risk without much liability-insulating compensation in exchange."[61] As a result, controllers were likely to, "at most, agree to such a [c]ondition at the insistence of a special committee and/or as a way to settle with the plaintiffs."[62] In essence, those subject to the economic consequences of the process — the minority stockholders — were left either without a say or with a say at the potential expense of additional consideration that might have been extracted by tougher economic bargaining.

Enter *MFW*. To avoid one of *Lynch*'s adverse consequences — using a majority-of-the-minority vote as a chit in economic negotiations with a Special Committee — *MFW* reviews transactions under the favorable business judgment rule if "these two protections are established up-front."[63] *MFW*'s dual conditions create "a potent tool to extract good value for the minority" because from the start of negotiations "the controlling stockholder knows that it cannot bypass the special committee's ability to say no."[64] The key concern of *MFW* was ensuring that

---

[60] *In re Cox*, 879 A.2d at 618.
[61] *Id.*
[62] *Id.*
[63] *MFW*, 88 A.3d at 644 (quoting *In re MFW*, 67 A.3d at 528).
[64] *Id.* (quoting *In re MFW*, 67 A.3d at 528).

controllers could not use the conditions as bargaining chips during economic negotiations:

> [T]he dual procedural protection merger structure optimally protects the minority stockholders in controller buyouts . . . . [W]hen these two protections are established up-front, a potent tool to extract good value for the minority is established. From inception, the controlling stockholder knows that it cannot bypass the special committee's ability to say no. *And, the controlling stockholder knows it cannot dangle a majority-of-the-minority vote before the special committee late in the process as a deal-closer rather than having to make a price move.*[65]

This requirement — having *MFW*'s dual requirements in place at the start of economic negotiations — helps replicate a third-party process and, simultaneously, incentivizes controllers to precommit to *MFW*'s conditions early to take advantage of business judgment review.[66] The essential element of *MFW*, then, is that these requirements cannot be dangled in front of the Special Committee, when negotiations to obtain a better price from the controller have commenced, as a substitution for a bare-knuckled contest over price.[67]

That is, the purpose of the words "*ab initio*," and other formulations like it in the *MFW* decisions, require the controller to self-disable before the start of

---

[65] *Id.* (quoting *In re MFW*, 67 A.3d at 528) (emphasis added).

[66] *Id.* ("The simultaneous deployment of the procedural protections employed here create a countervailing, offsetting influence of equal — if not greater — force. That is, where the controller irrevocably and publicly disables itself from using its control to dictate the outcome of the negotiations and the shareholder vote, the controlled merger then acquires the shareholder-protective characteristics of third-party, arm's-length mergers, which are reviewed under the business judgment standard.").

[67] *Id.*

substantive economic negotiations, and to have both the controller and Special Committee bargain under the pressures exerted on both of them by these protections. Thus, so long as the controller conditions its offer on the key protections at the germination stage of the Special Committee process, when it is selecting its advisors, establishing its method of proceeding, beginning its due diligence, and has not commenced substantive economic negotiations with the controller, the purpose of the pre-condition requirement of *MFW* is satisfied. In that situation, the Special Committee and the controller know, at all times during economic bargaining, that a transaction cannot proceed if the Special Committee says no, and the Special Committee knows that if they agree to a price, their judgment will be subject to stockholder scrutiny and approval.

And any ambiguity left by *MFW*'s various semantic phrases was clarified by *Swomley* where we affirmed the Court of Chancery in holding that *MFW*'s "*ab initio*" requirement is satisfied if the controller disables "before any negotiations t[ake] place."[68] In *Swomley*, the controller's first proposal was not conditioned on both of *MFW*'s dual requirements, yet we affirmed the Court of Chancery's holding that *MFW* applied, and the controller was thus entitled to business judgment rule review, because the controller conditioned the buyout on *MFW*'s dual requirements

---

[68] *Swomley*, 2014 WL 4470947, at *17–18.

"before any negotiations took place."[69] We adhere to our prior decision in *Swomley*, which affirmed the Court of Chancery's decision that to satisfy *MFW*'s "*ab initio*," or from inception, prong, a controller is required to condition the buyout on both the approval of an independent, fully empowered Special Committee and the approval of a majority of minority stockholders at the beginning stages of the process of considering a going private proposal and before any negotiations commence between the Special Committee and the controller over the economic terms of the offer.

Of course, adopting any rule, including this one, may give rise to close cases. But our Court of Chancery is expert in the adjudication of corporate law cases. And when a plaintiff has pled facts that support a reasonable inference that the two procedural protections were not put in place early and before substantive economic negotiation took place, the Court of Chancery can be trusted to apply appropriate pleading stage principles and refuse to dismiss the case

But that situation does not exist here. The plaintiff has pled no facts supporting a reasonable inference that Zhang did not condition the merger on *MFW*'s dual procedural protections before any economic negotiations took place. Although plaintiff is entitled to reasonable inferences from the facts pled,[70] we agree with the

---

[69] *Id.*
[70] *See Dunlap*, 878 A.2d at 438–39.

17

Court of Chancery that "[t]he plaintiff has not pled facts sufficient to call into question compliance with the *ab initio* requirement."[71]

The Court of Chancery found that Zhang "sent the Follow-up Letter just over two weeks after [he] first proposed the Merger, before the Special Committee ever convened and before any negotiations ever took place. The prompt sending of the Follow-up Letter prevented [Zhang] from using the [*MFW*] conditions as bargaining chips."[72] And the plaintiff pled no facts suggesting that the Special Committee or any member of the committee communicated with Zhang about the substance of the transaction before he sent the second letter.[73] Indeed, Zhang disabled before the Special Committee had hired its advisors. And the Special Committee spent months working with its advisors before asking Zhang for additional consideration. All of the Special Committee's work was done after Zhang had agreed to condition his buyout on *MFW*'s dual requirement. Zhang thus conditioned the buyout at the beginning of the process and is therefore entitled review under the business judgment rule standard.

In its briefs before us and below, the plaintiff spent most of his time on its bright line, one shot argument.[74] That was logical because the early second offer

---

[71] *In re Synutra*, 2018 WL 705702, at *3.
[72] *Id.*
[73] *Id.*
[74] *See* Opening Br. at 16–23.

18

was followed by several months of due diligence that occurred before any bargaining took place between the Special Committee and Zhang over the economic terms of the proposed transaction. But in a cursory part of his brief in opposition to the motion to dismiss and his brief in this Court, the plaintiff did argue that the decision of Synutra's CFO to grant Davis Polk a waiver constituted negotiations that, under *Swomley*, should prevent Zhang's second offer from satisfying the "from inception" requirement of *MFW*.[75] The plaintiff did so despite other pled facts demonstrating that the Special Committee was not even in existence at the time of the waiver much less involved in granting it.[76] As we have noted, after Zhang sent his initial offer, Synutra's CFO granted the company's law firm, Davis Polk, a waiver that allowed it to represent Zhang. And although the proxy does state that "[t]he waiver of Davis Polk's conflicts was negotiated and agreed by [Synutra's CFO] on behalf of the Company before the Company's board meeting," in context — and from the facts

---

[75] *See* App. to Opening Br. at A369–70 (Plaintiff's Combined Brief in Opposition to Defendants' Motions to Dismiss the Verified Amended Class Action Complaint (Nov. 30, 2017)) ("Finally, the Proxy states that Cai [the CFO] 'negotiated and agreed' to a waiver of Davis Polk's conflict of interest before the January 21 board meeting, clearly admitting that some negotiation with the Buyer Group had already taken place before the Board formed the Special Committee."); Opening Br. at 21 ("Plaintiff clearly alleged that in the interim, Cai 'negotiated and agreed' to a waiver of Davis Polk's conflict of interest before the January 21 board meeting, clearly admitting that some negotiation with the Buyer Group had already taken place before the Board formed the Special Committee.").

[76] *Id.* at A64–80 (Verified Amended Class Action Complaint (Feb. 10, 2017)).

19

pled — it is clear that the negotiation occurred around the terms of the waiver and not substantive terms of the proposed transaction.[77]

Consistent with its close and diligent consideration of the record, the Court of Chancery examined the waiver issue and whether it disqualified Zhang's second letter from satisfying *MFW*'s requirement that the two key procedural protections be in place at the beginning of the deal process and before economic negotiations commenced. In coming to the conclusion that the waiver did not preclude invocation of the business judgment rule, the Court of Chancery reasoned:

> The only arguably substantive event that happened before the Follow-up Letter was that the Company authorized Davis Polk to represent the Buyer Group by waiving any conflict that Davis Polk might have. Davis Polk was the Company's long-time counsel. It would have been preferable, both optically and substantively, for the Buyer Group to retain its own counsel. That scenario would have given the Special Committee the choice of hiring its own independent counsel or using Davis Polk, if it preferred to take advantage of Davis Polk's knowledge and expertise after considering the firm's potential ties to the Buyer Group. The Special Committee retained Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb"), a firm fully capable of going head-to-head with Davis Polk. The complaint does not plead facts that would support a reasonable inference that the conflict waiver undercut the Special Committee's effectiveness.[78]

We find no basis to quibble with the Court of Chancery's analysis on this point. The Special Committee did not engage in any substantive negotiation of

---

[77] *Id.* at A152 ((Schedule 14A, Definitive Proxy Statement, Synutra International, Inc. (Mar. 9, 2017)).

[78] *In re Synutra*, 2018 WL 705702, at *2.

Zhang's offer until well after it had engaged in a lengthy due diligence process led by its independent financial and legal advisors.[79]  And the complaint pled no facts suggesting — or from which we can rationally infer — that the waiver was exchanged for the two procedural protections or anything else.

At oral argument, the plaintiff seized on this issue in a way that it did not emphasize below or in its briefs to us.  As the defendants argue to us, it is likely that had the waiver not been granted, this would not have meant that Davis Polk could have represented the Special Committee.  Had it done so, the plaintiffs would likely have argued that its role as counsel for the company controlled by Zhang rendered it incapable of bargaining adversely to him on behalf of the Special Committee.

At best, therefore, Davis Polk would have been put in a neutral position, representing neither Zhang nor the Special Committee.  This would have been perhaps the ideal, optimal situation to create a level playing field.  But, on the pled facts, we agree with the Court of Chancery that the waiver did not obviate the application of the business judgment rule because no pled facts suggest any connection between the Davis Polk waiver and substantive consideration and negotiation of the economics of Zhang's offer.[80]  Thus, as to the only question posed

---

[79] *See id*. at A46–90 (Verified Amended Class Action Complaint (Feb. 10, 2017)).

[80] Neither below nor in its briefs before us did the plaintiff argue that the waiver granted to Davis Polk prevented the satisfaction of another requirement of *MFW*, which is that the Special Committee be "empowered to freely select its own advisors and to say no definitively." *MFW*, 88 A.3d at 645.  As the Court of Chancery found, the Special Committee selected a major law firm with substantial mergers and acquisitions experience to represent it. *In re Synutra*, 2018 WL

21

to us, which is whether Zhang conditioned his offer sufficiently early to satisfy the "from inception" requirement of *MFW*, the Court of Chancery correctly answered yes.

## III.

The plaintiff's other contention is that the Court of Chancery erred in finding that no due care violation was pled. The plaintiff reads dicta in footnote 14 of our *MFW* decision — dicta that conflict with the actual due care holding in *MFW* — as indicating that somehow a plaintiff may avoid the business judgment rule by raising questions about whether the Special Committee, despite concededly being independent, being advised by independent advisors, and conducting a lengthy procedural process, was adroit in bargaining. The plaintiff argues that this dicta allows him to plead a duty of care violation based on an insufficient price.[81]

But the entire point of the *MFW* standard is to recognize the utility to stockholders of replicating the two key protections that exist in a third-party merger:

705702, at \*2 ("The Special Committee retained Cleary Gottlieb Steen & Hamilton LLP ('Cleary Gottlieb'), a firm fully capable of going head-to-head with Davis Polk."). The complaint is devoid of any pled fact supporting an inference that the Special Committee's counsel was not equipped to represent the Special Committee skillfully and vigorously, nor that it failed to do so. And of course, the waiver granted to Davis Polk had no bearing on which financial advisor the Special Committee selected. Although we have no doubt that the selection of qualified advisors is important to the effectiveness of a special committee, the plaintiff did not argue, and has pled no facts supporting any inference, that the Special Committee here was not empowered to select a highly qualified legal counsel of its choice.

[81] Footnote 14 in *MFW* is dicta musing on whether the complaint in *MFW* could have survived a motion to dismiss. 88 A.3d at 645 n.14. But, one was never brought, and the skilled lawyers who ultimately won the case likely would have had much to say about whether that was so. Our system of justice depends on the courts hearing out both sides, and a footnote speculating about the

22

an independent negotiating agent whose work is subject to stockholder approval.[82]

If that standard injects the reviewing court into an examination of whether the

Special Committee's good faith efforts were not up to the court's own sense of

business effectiveness, the standard is without the very utility it was designed to

accomplish, motions to dismiss will not be able to be granted, and controllers will

therefore have no incentive to use the approach most favorable to minority

stockholders.[83]

For that reason, the key paragraph of *MFW* itself addressing whether there

was any disagreement of fact about whether the Special Committee had acted with

gross negligence reads as follows:

> The Special Committee Exercised Due Care. The Special Committee
> insisted from the outset that MacAndrews (including any "dual"
> employees who worked for both MFW and MacAndrews) be screened
> off from the Special Committee's process, to ensure that the process
> replicated arm's-length negotiations with a third party. In order to

---

outcome of a motion that was never brought is a clear example of dicta. More important, to the extent that note 14 is inconsistent with this decision, *Swomley*, or the Court of Chancery's opinion in *MFW*, it is hereby overruled. The whole point of *MFW* is to give a pathway whereby judicial review of the economics of a transaction can be avoided if the correct parties (impartial directors and the minority stockholders themselves) are given the appropriate authority. Footnote 14 confusingly suggests that a due care violation can be premised, not on a court's view that a special committee did not lean in and do its work with diligence, but on a court's after the fact sense that the committee should have extracted more price concessions. That, of course, is not what due care review is about, and even more, the point of requiring the majority-of-the-minority condition is to allow the real parties in interest the say on economics and the chance to say no for themselves.

[82] *MFW*, 88 A.3d at 644 ("[W]here the controller irrevocably and publicly disables itself from using its control to dictate the outcome . . . the controlled merger then acquires the shareholder-protective characteristics of third-party, arm's-length mergers . . . .").

[83] *Id.* at 645 ("[T]he adoption of this rule will be of benefit to minority stockholders because it will provide a strong incentive for controlling stockholders to accord minority investors the transactional structure that . . . will provide them the best protection . . . .") (emphasis omitted).

carefully evaluate M & F's offer, the Special Committee held a total of eight meetings during the summer of 2011 . . . . In scrutinizing the Special Committee's execution of its broad mandate, the Court of Chancery determined there was no "evidence indicating that the independent members of the special committee did not meet their duty of care . . . ." To the contrary, the Court of Chancery found, the Special Committee "met frequently and was presented with a rich body of financial information relevant to whether and at what price a going private transaction was advisable." The Court of Chancery ruled that "the plaintiffs d[id] not make any attempt to show that the MFW Special Committee failed to meet its duty of care . . . ." Based on the undisputed record, the Court of Chancery held that, "there is no triable issue of fact regarding whether the [S]pecial [C]ommittee fulfilled its duty of care."[84]

As can be seen, that paragraph, which is a holding, focuses as it should on due care and not whether someone might question whether the Special Committee's sufficiently diligent efforts resulted in a negotiated price that was fair. The price question is not one for a court applying the business judgment rule standard, and was for MFW's stockholders to vote on themselves.

Any ambiguity arguably created by the confusing dicta in *MFW* — suggesting that challenging price was sufficient to state a duty of care violation — was clarified by *Swomley*. In *Swomley*, the Court of Chancery held that, in the context of a controlling stockholder transaction that was preconditioned on *MFW*'s dual requirements, a plaintiff could not get past a motion to dismiss merely by suggesting that the Special Committee "could have negotiated [ ] differently" because that is "a

---

[84] *Id.* at 651–52.

matter of strategy and tactics that's debatable and isn't a duty of care violation."[85] And the Court of Chancery in *Swomley* held that the "[d]uty of care is measured by a gross negligence standard," and "disagree[ing] with the [special] committee's strategy" is not a duty of care violation.[86]

This Court affirmed that holding, eliminating any ambiguity created by *MFW* and confirming that a plaintiff can plead a duty of care violation only by showing that the Special Committee acted with gross negligence, not by questioning the sufficiency of the price.

Here, the Court of Chancery appropriately read *MFW* as requiring it to determine, under the high standard of gross negligence, whether the plaintiff had stated a due care claim. Given the Special Committee's extensive deliberations, receipt of extensive advice and information from its financial and legal advisors, and negotiations with Zhang, the Court of Chancery correctly found "[t]he complaint's allegations, considered individually and in the aggregate, do not support an inference of gross negligence."[87]

---

[85] *Swomley*, 2014 WL 4470947, at *21, *aff'd* 128 A.3d 992 (Del. 2015) (TABLE).
[86] *Id.*
[87] *In re Synutra*, 2018 WL 705702, at *5–6.

## IV.

The Court of Chancery faithfully applied our precedents in holding that the business judgment rule applied and dismissing the plaintiff's complaint. Its decision is hereby affirmed.

**VALIHURA**, Justice, dissenting:

## I.    *Overview*

I differ with the views of my learned colleagues on the important question of what the test should be for invoking business judgment protection in controller buyout transactions.  The Majority's adoption of the "when the negotiations begin" test invites factual inquiries that defeat the purpose of what should be more of a bright line and narrower pathway for pleading-stage dismissals in this context. Instead, I believe this Court did conclude in *M&F Worldwide*, and should reaffirm now, that in controller squeeze-out transactions where the controller is on both sides, the *ab initio* requirement is satisfied when the Dual Protections are contained in the controller's initial formal written proposal.  This bright-line makes sense because the controller dictates when to commence the transactional process so that the outset is clear.  Here, the outset was the January 14 Proposal.

Ordinarily, transactions involving conflicts of interest are subjected to our most rigorous form of judicial review: entire fairness.  Under such circumstances, Defendants bear the burden of proving two elements: fair dealing and fair price.  This is a heavy lift.  However, this Court has recognized that conflicted transactions may merit a more deferential type of judicial examination when certain procedural protections are in place: when such conditions are satisfied, the sale process may be

said to replicate arm's-length dealing and, thus, the business judgment rule is appropriate.

The Court of Chancery outlined these preconditions for business judgment review of conflicted transactions in *In re MFW Shareholders Litigation*,[1] and this Court adopted its framework—albeit, with some refinements—in *Kahn v. M&F Worldwide*.[2] Adopting six prerequisites set forth by the trial court, this Court held that in controller buyout transactions:

> [T]he business judgment standard of review will be applied *if and only if*: (i) the controller conditions the procession of the transaction[s] on the approval of both a Special Committee and a majority of the minority stockholders; (ii) the Special Committee is independent; (iii) the Special Committee is empowered to freely select its own advisors and to say no definitively; (iv) the Special Committee meets its duty of care in negotiating a fair price; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority.[3]

We explained further that "business judgment is the standard of review that should govern mergers between a controlling stockholder and its corporate subsidiary, where the merger is conditioned *ab initio* upon both the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; and the uncoerced, informed vote of a majority of the minority stockholders."[4]

---

[1] 67 A.3d 496, 502 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

[2] 88 A.3d 635 (Del. 2014).

[3] *Id.* at 645 (emphasis in original).
[4] *Id.* at 644.

Thus, for the so-called *MFW* standard to apply: (1) the transaction must be conditioned *ab initio* on (2) approval by both (a) "an independent, adequately-empowered Special Committee that fulfills its duty of care," and (b) "the uncoerced, informed vote of a majority of the minority stockholders."[5] For simplicity, I refer to the six-factor test quoted above as the *MFW* Framework, and the two conditions—(a) special committee approval, and (b) stockholder vote approval—as the Dual Procedural Protections.

In reviewing the role of a Special Committee, we observed that "the special committee must 'function in a manner which indicates that the controlling stockholder did not dictate the terms of the transaction and that the committee exercised real bargaining power "at an arms-length."'"[6] This requirement, which implicates the second, third, and fourth *MFW* factors, is a qualitative inquiry as to how the committee actually functioned—not simply a finding that the process checked certain boxes in the *MFW* formula.[7]

---

[5] *Id.*

[6] *Id.* at 646 (quoting *Kahn v. Tremont Corp.*, 694 A.2d 422, 429 (Del. 1997)).

[7] *See Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1148 (Del. Ch. 2006) ("If a parent seeks to satisfy the high standard of entire fairness by establishing a special committee, its burden to show fair dealing cannot be satisfied by orchestrating a stylized mockery of arm's-length negotiation." (citing *Rabkin v. Olin Corp.*, 1990 WL 47648, at *6 (Del. Ch. Apr. 17, 1990))).

As such, *M&F Worldwide* was careful to warn that defendants would have difficulties in invoking such protections through a motion to dismiss.[8] We observed that, "[i]f a plaintiff that can plead a reasonably conceivable set of facts showing that any or all of those enumerated conditions did not exist, that complaint would state a claim for relief that would entitle the plaintiff to proceed and conduct discovery."[9]

In my view, the plaintiff Arthur Flood ("Plaintiff") has pled facts making it reasonably conceivable that at least one of the *MFW* preconditions was not satisfied. Plaintiff has sufficiently pled that the controller did not establish the Dual Procedural Protections as preconditions to a deal up front, *ab initio*. As to other preconditions, I agree with the Majority that the Plaintiff presented some refined arguments on appeal that were, at best, only weakly alluded to below. For example, Plaintiff did not expressly allege in the Amended Complaint that the Davis Polk conflict and conflict waiver gave rise to a challenge to the Special Committee's empowerment to

---

[8] *M&F Worldwide*, 88 A.3d at 646 ("As we have previously noted, deciding whether an independent committee was effective in negotiating a price is a process so fact-intensive and inextricably intertwined with the merits of an entire fairness review (fair dealing and fair price) that a pretrial determination of burden shifting is often impossible." (citing *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012))).

[9] *Id.* at 645 (citations omitted); s*ee also id.* at 645 n.14 (noting that the complaint in *MFW* would have survived a motion to dismiss under this standard and warranted discovery; the case was only dismissed at summary judgment); *In re Martha Stewart Living Omnimedia, Inc. S'holder Litig.*, 2017 WL 3568089, at *17 (Del. Ch. Aug. 18, 2017) ("This strict or 'formalistic' approach to pleadings-stage transactional standard of review determinations in *In re MFW* and *M&F Worldwide* was not at all surprising. Because the court was addressing whether the minority stockholders' claim should be dismissed before discovery, both this court and the Supreme Court took pains to provide a detailed road map of the points of protection the controller must visit to earn business judgment deference on a motion to dismiss." (citations omitted)).

4

freely select its own advisors, although he did raise the Davis Polk conflict in the complaint and opening brief below.[10]  At oral argument before the trial court, the Davis Polk conflict waiver was raised by Plaintiff—but more in the context of arguing that "negotiations" had commenced and, therefore, the *ab initio* requirement had not been satisfied.

It was only in response to a question from the trial court at oral argument on the motion to dismiss that Plaintiff eventually argued that there was an issue with the Special Committee's empowerment to freely select its advisors.[11]  Thereafter, on appeal, Plaintiff's counsel argued before this Court that the empowerment issue was "intertwined"  with the *ab initio* argument, but he conceded that he had not framed the issue as an "empowerment" issue before the trial court.[12]  Though I agree that the "empowerment" issue was not fairly presented below, those intervening events are intertwined with the *ab initio* requirement and illustrate how the "negotiations" test can devolve into the type of fact-intensive inquiry we were trying to avoid. Accordingly, I believe the motion to dismiss should have been denied based upon Defendants' failure to satisfy the *ab initio* test.  For the reasons set forth below, I respectfully dissent.

---

[10] Plaintiff's Combined Br. in Opposition to Defendants' Motion to Dismiss, at A356, A382.
[11] Oral Argument on Defendants' Motion to Dismiss, at A510.
[12]         Oral         Argument         video         at         17:45;         18:59–19:20, https://livestream.com/DelawareSupremeCourt/events/8366324/videos/180173490    [hereinafter Oral Argument].

## II.    Facts

I focus my examination of the facts on the three weeks relevant to Plaintiff's most salient allegations on appeal, from mid-January 2016 to early February 2016.

On January 14, 2016, Mr. Zhang and Beams Power sent a letter to the Company's directors that included a non-binding proposal to acquire all issued and outstanding shares of Synutra's common stock not already beneficially owned by them for $5.91 per share in cash (the "January 14 Proposal").[13]  The letter indicated, among other things, that they arrived at the $5.91-per-share price because they believed it represented a "fair and attractive opportunity for the minority stockholders to exit their investment in the Company."[14]  The letter mentioned that the prospective buyers still needed to conduct the customary due diligence and that they had engaged Davis Polk & Wardwell LLP ("Davis Polk") as their U.S. legal counsel.  According to the letter, Davis Polk was prepared to negotiate and finalize the definitive transaction documents "promptly."

But Davis Polk was also counsel to the Company.  Thus, "[t]o avoid any conflict of interest arising from the role of Davis Polk,"[15] the Company's CFO, Ms. Ning Cai, began the process of engaging separate U.S. legal counsel for work related

---

[13] Schedule 14A, Synutra Int'l Inc. (March 9, 2017), at 19 (A151) [hereinafter, "Proxy"].  The facts are largely drawn from the Proxy and are not challenged on appeal.

[14] *Id.*

[15] *Id.* at 20 (A152).

to the January 14 Proposal.  On January 15, 2016, Ms. Cai reached out to Wilson, Sonsini, Goodrich & Rosati P.C. ("Wilson Sonsini") about the possibility of retaining that firm.

Meanwhile, Ms. Cai had been conducting diligence on Mr. Yalin Wu as a potential candidate for independent director of the Company.  Mr. Zhang had referred him to her in early December 2015 after a "personal friend" of Mr. Zhang's had recommended Mr. Wu as a potential candidate for an open seat.  On January 19, 2016, Ms. Cai nominated Mr. Wu as director.

Ahead of the Company's special telephonic board meeting scheduled for January 21, 2016, Ms. Cai also negotiated and signed a conflicts waiver with Davis Polk and asked Davis Polk representatives to attend that meeting.  According to the Proxy, the Board requested the participation of Davis Polk despite the firm's role as counsel to the Buyer Group because Davis Polk had "frequently advised" the Board, and the Company had not yet engaged separate U.S. legal counsel.[16]  The Davis Polk attorneys advising the Buyer Group were not the same Davis Polk attorneys advising the Board.

At the special telephonic meeting held on January 21, 2016, the Board unanimously voted to appoint Mr. Wu as an independent director, and he then joined the meeting.  According to the Proxy:

---

[16] *Id.*

7

Representatives of Davis Polk advised the directors as to their fiduciary duties under Delaware law in considering and evaluating the January 14 Proposal and further stated that it would be advisable for our board of directors to consider forming a special committee solely consisting of independent and disinterested directors to ensure that unaffiliated stockholders would be adequately protected during the board's evaluation of the January 14 Proposal and any other alternative offers involving the Company.[17]

The Board followed Davis Polk's advice as disclosed in the Proxy. Other than Mr. Zhang, who abstained, the Board unanimously resolved to form a special committee (the "Committee") of three independent directors "to consider and attend to all matters in connection with the January 14 Proposal and any other alternative proposals, and to ensure that the unaffiliated stockholders would be adequately protected during the Company's consideration and evaluation of the proposed transaction."[18] Ms. Jinrong Chen served as chair, and Mr. Lei Lin and Mr. Wu rounded out the Committee.

According to the Proxy, the Board authorized the Committee to retain its own legal counsel, financial advisor, or other agents related to the transaction contemplated under the January 14 Proposal. The Board further resolved that the Committee could pass resolutions by majority vote, and that it would direct the

---

[17] *Id.* at 21 (A153).

[18] *Id.*

8

Company's officers, advisors, and employees to provide any information and assistance to the Committee or its advisors.

Following the meeting, Davis Polk ceased representing the Company in connection with the January 14 Proposal or any such transaction. However, the firm continued to represent the Company on different matters through March 5, 2016.

Between January 21 and February 1, 2016, the members of the Committee—alongside Synutra CFO Ms. Cai—interviewed four law firms for engagement as the Committee's counsel, including Cleary Gottlieb Steen & Hamilton ("Cleary"). At their first meeting with Cleary, on January 23, a firm representative "introduced Cleary's qualifications and experience in mergers and acquisitions transactions."[19] At their second meeting, on January 29, Cleary "further introduced its practice and expertise, and specifically explained the fiduciary duties of the special committee in connection with the proposed transaction."[20] The Committee still had not finalized its engagement of Cleary as counsel.

That day, January 29, 2016, the Company retained Wilson Sonsini as the Company's U.S. legal counsel.

The next day, January 30, 2016, the Committee received another letter from Mr. Zhang and Parent (the "January 30 Letter" or "Follow-up Letter"). In it, the

---

[19] *Id.*

[20] *Id.*

9

Buyer Group reaffirmed the terms outlined in its January 14 Proposal and then included, for the first time,[21] the Dual Procedural Protections.

The Committee convened a telephonic meeting the following day, February 1, 2016. Ms. Cai and Cleary representatives also attended. At the meeting, the Committee decided to retain Cleary as independent U.S. legal counsel, and Cleary then advised the members on "the key issues and implications with respect to a going-private transaction, including the special committee's evaluation of the fairness of the proposed transaction to the Company's unaffiliated stockholders and the directors' fiduciary duties under Delaware law."[22] They also discussed the next steps, including the hiring of an independent financial advisor, and the Committee instructed Ms. Cai and Cleary to begin reaching out to possible candidates.

After the meeting, Ms. Cai and Cleary contacted three investment banks to solicit their interest in serving as financial advisor, and, on February 2, the Committee interviewed three of them. The Committee decided to continue evaluating two of these banks, including Houlihan Lokey ("Houlihan"), and asked Cleary to start negotiating engagement letters with them.

---

[21] The Proxy states that the January 30 Letter "confirmed" the following conditions, *see id.*, but both parties agree that these conditions were first included in the January 30 Letter, so the use of "confirm" seems somewhat misleading. *Id.*

[22] *Id.* at 22 (A154).

On February 2, 2016, the Committee appointed Ms. Xuan Xie, a member of management (the Secretary to the Board), as the coordinator of the Committee. Ms. Xie was privy to the Committee's deliberations throughout the process.[23]

On February 3, the full Board held a meeting, attended by attorneys from Wilson Sonsini. Mr. Zhang abstained from voting on the Board resolution setting forth the powers of the Committee.[24] The Board resolved not to approve or recommend the proposed transaction absent a prior, favorable recommendation from the Committee.

On February 4, 2016, the Committee retained Houlihan as independent financial advisor, and the sale process began in earnest.

Months later, on November 17, 2016, after the merger consideration was raised to $6.05 per share and Houlihan provided its opinion that the transaction was fair, from a financial point of view, to the minority stockholders, the Committee unanimously recommended that the Board approve the transaction.[25] The Board then resolved to approve the merger agreement and to recommend the merger to

---

[23] *Id.* The Proxy states that, "[t]he duties and responsibilities of the coordinator of the special committee mainly included, among others, provision of administrative support to the special committee (*e.g.*, meeting scheduling, logistics, budget management), internal and external communication in connection with the proposed transaction, and supervision of the communications and provision of information by the directors and employees of the Company in connection with the proposed transaction." *Id.*

[24] *Id.* at 23 (A155).

[25] *Id.* at 34 (A166).

stockholders—whose approval was required for the transaction to close—and the parties signed the agreement.[26]

Following briefing and oral argument, in an order dated February 2, 2018, the Court of Chancery dismissed all claims. It found the *MFW* requirements satisfied, and because Plaintiff did not allege waste, it dismissed the complaint.[27]

### III. Analysis

I believe the *ab initio* requirement was not satisfied here. In *M&F Worldwide*, we held that the business judgment rule applies to conflicted transactions "where the merger is conditioned *ab initio* upon both the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; and the uncoerced, informed vote of a majority of the minority stockholders."[28] Admittedly, the term, *ab initio*—meaning, literally, from the beginning—lacks some precision in the abstract. But in the context in which that term was used, it meant from the time of the controller's first written proposal—as that is exactly what happened in that case.

In *MFW*, the defendants argued that, where the merger is conditioned on the two procedural protections up front—and defendants show pretrial that those

---

[26] *Id.*

[27] *In re Synutra Int'l, Inc.*, 2018 WL 705702, at *6 (Del. Ch. Feb. 2, 2018) (ORDER) [hereinafter *Chancery Order*].

[28] *M&F Worldwide*, 88 A.3d at 644.

12

conditions were in fact satisfied—then the transaction process mimics an arm's-length, third-party merger as ordinarily consummated under 8 *Del. C.* § 251, and should be reviewed as such.[29]  The defendants argued that "Special Committee approval in a going private transaction is a proxy for board approval in a third-party transaction, and that the approval of the unaffiliated, noncontrolling stockholders replicates the approval of all the (potentially) adversely affected stockholders."[30]  In the arm's-length, third-party context, the buyer and target seeking to consummate a transaction under Section 251 know the requirements from the outset, given the existence of the statute: approval by both a majority of the board of directors[31] and a majority of stockholders of each constituent corporation.[32]  *M&F Worldwide* advises that, in order for conflicted transactions to mimic that process, the same should be true—the Dual Procedural Protections must be in place in the first proposal so that they may not be used as bargaining chips in the negotiations.[33]

---

[29] *Id.* at 639–40 ("Defendants submit that a Special Committee approval in a going private transaction is a proxy for board approval in a third-party transaction, and that the approval of the unaffiliated, noncontrolling stockholders replicates the approval of all the (potentially) adversely affected stockholders.").

[30] *Id.* at 640; *see also In re Cox Commc'ns, Inc. S'holders Litig*., 879 A.2d 604, 618–19 (Del. Ch. 2005) (likening independent special committee approval and majority-of-the-minority approval to the "independent integrity-enforcing functions" of board approval and stockholder approval in an arm's-length transaction, respectively).

[31] 8 *Del. C.* § 251(b).

[32] *Id.* § 251(c).

[33] *M&F Worldwide*, 88 A.3d at 639 (noting that, when such conditions are satisfied, "the negotiation and approval process" are said to "replicate those that characterize a third-party merger").

13

The Court of Chancery explained the rationale in *MFW* as follows:

> When these two protections are established up-front, a potent tool to extract good value for the minority is established. From inception, the controlling stockholder knows that it cannot bypass the special committee's ability to say no. And, the controlling stockholder knows it cannot dangle a majority-of-the-minority vote before the special committee late in the process as a deal-closer rather than having to make a price move. From inception, the controller has had to accept that any deal agreed to by the special committee will also have to be supported by a majority of the minority stockholders.[34]

The language used by both the Court of Chancery and this Court in *M&F Worldwide* is somewhat imprecise if taken out of that context. The Court of Chancery's opinion in *MFW* held that those the protections had to be in place "from the time of the controller's *first overture*."[35] However, on appeal, this Court used slightly different language in affirming and held that the Dual Procedural Protections had to be in place *ab initio*. We did quote with approval language from the trial court requiring those protections to be "established *up-front*" and "*from inception*."[36]

---

[34] *MFW*, 67 A.3d at 528; *see also In re Sauer-Danfoss, Inc. S'holder Litig.*, C.A. No. 8396-VCL (Del. Ch. Oct. 23, 2013) (TRANSCRIPT), at 77; *id.* at 80 ("[T]he controller has to step back in a matter analogous to a third-party transaction at both the board and stockholder levels, and they have to do so at the outset.").

[35] *MFW*, 67 A.3d at 502 (emphasis added); *see also Sauer-Danfoss*, C.A. No. 8396-VCL, at 75 ("What *MFW* says, and which *Cox Communications* said before that, is that these have to be set up at the outset. So in the words of *MFW*, those conditions have to apply 'from the time of the controller's first overture.'"). *But see id.* at 78 ("[P]erhaps it's an overstatement, to the extent from the time of the controller's first overture suggests, that it actually has to be in the very first letter. Perhaps that might be a little bit of an overstatement, but they have to be out there from the beginning.").

[36] *M&F Worldwide*, 88 A.3d at 644 (quoting *MFW*, 67 A.3d at 528).

14

Although "first overture," "up front," and "from inception," as well as "*ab initio*," could also include anything on a continuum from first utterances to nascent stage discussions, we were addressing a situation where the Dual Protections were contained in the controller's first written merger proposal. We quoted the relevant portions of the controller's written proposal that contained the Dual Protections and then observed:

- "We hold that business judgment is the standard of review that should govern mergers between a controlling stockholder and its corporate subsidiary, where the *merger* is conditioned *ab initio* upon both the approval of an independent adequately empowered Special Committee that fulfills its duty of care; and the uncoerced, informed vote of a majority of minority stockholders."[37]

- "To reiterate, in this case, the controlling stockholder *conditioned its offer* upon the MFW Board agreeing *ab initio*, to both procedural protections . . . ."[38]

Thus, consistent with this rationale, "*ab initio*" means from the controller/buyer's first written proposal, because in *M&F Worldwide*, the buyer stated in its *initial* letter proposal to the MFW board that it was conditioning its offer on satisfaction of the Dual Procedural Protections.[39]

---

[37] *Id.* (emphasis added).
[38] *Id*. at 646 (emphasis added).
[39] *Id.* at 640.

In the early post-*M&F Worldwide* case of *In re Books-A-Million, Inc. Stockholders Litigation*,[40] the controller group followed the *M&F Worldwide* playbook and "conditioned any transaction, from the outset, on approval by both a special committee of independent directors and a non-waivable vote of disinterested stockholders," by imposing those requirements in his first letter proposal.[41] In finding that the *ab initio* requirement was satisfied, the Court of Chancery observed that "[t]he Complaint does not allege that the Anderson Family delayed establishing the conditions, waivered from them, or sought to circumvent them."[42]

In *Swomley v. Schlecht*,[43] this Court confronted an attempt to push the possibility of satisfying the *ab initio* requirement just slightly beyond the first offer. We summarily affirmed the Court of Chancery's ruling that the *ab initio* requirement was satisfied even though the initial letter proposal "hedged on whether the majority-of-the-minority condition would be waivable or not."[44] The Court of Chancery

---

[40] 2016 WL 5874974 (Del. Ch. Oct. 10, 2016), *aff'd*, 164 A.3d 56 (Del. 2017).

[41] *Id.* at *8 (also noting that the letter's "operative text" was "substantively identical to what was held to be sufficient in *M & F Worldwide*").

[42] *Id.* In *In re Cox Communications, Inc. Shareholders Litigation*—a precursor case to *MFW*— the Court of Chancery awarded burden-shifting even though the Dual Procedural Protections were not in place at the first board meeting at which directors heard the controller's plans to submit a takeover proposal because the controller submitted its proposal by letter *immediately following* that meeting—*i.e.*, that same day—and included the requirement of special committee approval. *Cox*, 879 A.2d at 607; *see also In re Martha Stewart*, 2017 WL 3568089, at *18 (whether the controller is on both sides, the *MFW* conditions can be included in the initial offer).

[43] C.A. No. 9355-VCL (Aug. 27, 2014) (TRANSCRIPT), *aff'd*, 128 A.3d 992, 2015 WL 7302260 (Del. 2015) (TABLE).

[44] *Id.* at 70.

16

found that the Dual Procedural Protections were in place *ab initio* because, "from the first meeting" at which the board considered the transaction—held the *same day* the control group had proposed the transaction—the board resolved that any deal would require both the approval of a special committee and a majority-of-the-minority vote, and the controller was part of the Board that passed those resolutions.[45] In his transcript ruling, the Vice Chancellor observed that the plaintiff had failed to call into question the defendants' satisfaction of the *ab initio* requirement because "[a]ll this went down before any negotiations took place, even before anything really started."[46]

In this case, the Court of Chancery relied on *Swomley* in moving the *ab initio* needle from "up front" and "from inception" of the first offer to holding that "a process meets the *ab initio* requirement when the controller announces the conditions 'before any negotiations took place.'"[47] The court reasoned that "[u]sing this point in time fulfills the goals of disabling the controller for purposes of the negotiations and ensuring that the controller 'cannot dangle a majority-of-the-minority vote before the special committee late in the process as a deal-closer rather than having to make a price move.'"[48]

---

[45] *Id.*

[46] *Id.* at 71.

[47] *Chancery Order*, 2018 WL 705702, at *2 (quoting *Swomley,* C.A. No. 9355-VCL, at 71).

[48] *Id.* (quoting *M&F Worldwide*, 88 A.3d at 644).

17

Perhaps in summarily affirming the transcript ruling in *Swomley*, we muddied the waters when we approved the trial court's language suggesting that the start of "negotiations" (rather than the submission of the first proposal) is the test for determining whether the *ab initio* requirement is satisfied. But, as in *M&F Worldwide*, we held that the Dual Procedural Protections must be in place when the controller submits a written offer so that the Dual Procedural Protections cannot be "dangled" at a point "late in the process as a deal-closer rather than having to make a price move."[49] This makes sense in situations where the controller is on both sides, as the controller decides when to begin the negotiations and on what terms. In cases like this, the outset is clear. In any event, I do not believe our summary affirmance should be read as a deliberate intention on our part to expand the *ab initio* requirement into a sliding scale factual inquiry involving an analysis of when serious bargaining began following submission of an initial written proposal.[50]

In contrast to the bright-line we tried to draw in *M&F Worldwide*, here, the Dual Procedural Protections were indisputably absent from the January 14 Proposal. They were still absent *a week after* the Board received the proposal and held its first meeting on January 21. *More than two weeks* passed before the Dual Procedural Protections were included in the controller's January 30 Offer.

---

[49] *MFW*, 67 A.3d at 528.
[50] Even Defendants conceded the factual nature of this inquiry. *See* Ans. Br. at 20 ("When negotiations actually begin must be determined based on the specific facts of the case at hand.").

18

Meanwhile, several important "things" occurred before the imposition of the Dual Procedural Protections. These "things" have led us down a path of a messy pleadings stage fact-intensive inquiry. Among other things, the Company's CFO (Ms. Cai) unilaterally waived Davis Polk's conflict and Davis Polk represented both the Buyer Group and the Board at the intervening January 21 Board meeting, and Ms. Cai continued to play a role in the Committee's selection of both legal and financial advisors, and in other aspects of the Committee process—as did Ms. Xie following the January 30 Offer.

As noted above, it was the trial court, during oral argument on the motion to dismiss, that raised the Committee empowerment issue by citing the case, *In re Emerging Communications, Inc. Shareholders Litigation*.[51] In that case, the Court of Chancery viewed a controller's retention of the target company's longtime outside counsel and financial advisors—the same advisors whom the target had used in an earlier, failed acquisition bid, and who had been the company's counselors for its "entire existence"—as negatively impacting the transaction's overall fairness.[52] The court considered it "unfair" because those advisors "possessed material nonpublic

---

[51] 2004 WL 1305745, at *32 (Del. Ch. May 3, 2004).

[52] *Id.*

19

information about [the company's] values, business and prospects" and "were in the best position to represent the interests of the [company's] minority."[53]

Treatises and Delaware court opinions alike have long emphasized that "no role is more critical with respect to protection of shareholder interests in these matters than that of the expert lawyers who guide sometimes inexperienced directors through the process . . . ."[54] After all, "professional advisors have the ability to influence directors who are anxious to make the right decision but who are often in *terra [in]cognit[a]*."[55] As one treatise cautions, not everyone has heeded the value of independence, and "[e]xamples abound of situations where advisors were 'preselected' by someone other than the [special committee]—either management

---

[53] *Id. See also* Michael D. Allen, Srinivas M. Raju & Gregory V. Varallo, *Special Committees Law & Practice*, § 3.06[4] (1st ed. 2011) (available via Lexis) ("[N]otwithstanding the critical importance of counsel being independent and free from conflict, there are also situations in which some background with the company will make counsel more, rather than less, valuable to the committee.").

[54] *See* Allen, *supra* note 53, at § 3.06[1] (available via Lexis) ("The retention of competent and skilled advisors may be the decision by the committee that is most critical to the success of the committee's work."); Andrew M. Johnston & S. Mark Hurd, *Special Committees of Independent Directors*, 79 C.P.S. (BNA), at A-19 ("The selection by the [special committee] of competent, able advisors is of critical importance to the proper discharge of the [special committee's] responsibilities."). *See also In re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147, at *720 (Del. Ch. Aug. 8, 1988) ("It is obvious that no role is more critical with respect to protection of shareholder interests in these matters than that of the expert lawyers who guide sometimes inexperienced directors through the process.").

[55] *Tremont*, 694 A.2d at 429; Allen, *supra* note 53, at § 3.06[1] ("[N]o matter how straightforward the task of a committee may seem, [the special committee's] assignment will soon descend into *terra incognita* and having a skilled guide along the way is likely to mean the difference between a special committee that helps the corporation (in terms of shifting burdens or otherwise) and one that does not.").

or the interested party—which, in turn, compromised the work of the [special committee]."[56]

It was only on appeal that Plaintiff squarely contended that they were entitled to a pleading-stage inference that the Buyer Group sought to influence the Committee's work at its nascent stages, before it had its own counsel to protect it. And only on appeal did Plaintiff focus more specifically on Defendants' various departures from certain "best practices" that potentially impact the functioning of the Committee.

For example, Plaintiff, on appeal, emphasized the fact that the Committee allowed the Company's CFO to continue to participate in the workings of the Committee, including the selection of its ostensibly independent advisors. Although back and forth bargaining on deal terms may not have commenced at that point, the Committee's selection of counsel can set the tone and significantly impact the quality of the Committee's work.[57] We recognized this in *Kahn v. Tremont Corp.*,[58] where we questioned the independence of a special committee that "promptly" selected a legal advisor recommended by the company's general counsel. We

---

[56] Johnston, *supra* note 54, at A-19.

[57] *See Kahn v. Dairy Mart Convenience Stores, Inc.*, 1996 WL 159628, at *8 n.6 (Del. Ch. Mar. 29, 1996) ("Another critical factor in assessing the reliability and independence of the process employed by a special committee, is the committee's financial and legal advisors and how they were selected.").

[58] 694 A.2d 422, 429 (Del. 1997).

21

observed that "the circumstances surrounding the retaining of the Special Committee's advisors, as well as the advice given, cast serious doubt on the effectiveness of the Special Committee."[59] Plaintiff attempted to draw a parallel here with Ms. Cai's involvement in selection of the Committee's financial advisor, and with Ms. Xie's role as the Committee's coordinator with the Board.

On appeal, Plaintiff sharpened his focus on the Davis Polk conflict, and cites it as further evidence that the Board continued to stray from best practices. Instead of empowering a special committee with its own independent counsel, the Board, on January 21, received advice on their fiduciary duties and on setting up a special committee from the *same* law firm advising the Buyer Group, and in the presence of a key member of the controlling Buyer Group, Mr. Zhang, who was attending that meeting as a director and who did not recuse himself.

As to the conflict waiver, the Court of Chancery observed that "[t]he only arguably substantive event that happened before the Follow-up Letter was that the Company authorized Davis Polk to represent the Buyer Group by waiving any conflict that Davis Polk might have."[60] The Court of Chancery recognized that "[i]t

---

[59] *Id.*; *see also Dairy Mart*, 1996 WL 159628, at *2, *8 n.6 (criticizing process where special committee chose law firm recommended by a former board member and current partner at law firm that was recommending the company). At oral argument before this Court, Plaintiff also criticized the Committee's involvement of Ms. Xie in their deliberative process. Video at 20:31; *see also* Proxy, at 22 (A154).

[60] *Chancery Order*, 2018 WL 705702, at *2.

22

would have been preferable, both optically and substantively, for the Buyer Group to retain its own counsel."[61] As it further explained, "[t]hat scenario would have given the Special Committee the choice of hiring its own independent counsel or using Davis Polk, if it preferred to take advantage of Davis Polk's knowledge and expertise after considering the firm's potential ties to the Buyer Group."[62] But the trial court concluded, after having denied Plaintiff's motion for expedited discovery, that "[t]he granting of the conflict waiver to Davis Polk did not transform the Follow-up Letter from a pre-negotiation self-disablement into a mid-stream trade-off."[63]

When these intervening events are viewed in the aggregate, Plaintiff convincingly says, albeit in mud-splatter fashion, that they were entitled to pleading-stage inferences that there was "too much interaction, intermingling, and overlapping between the Buyer Group and the Board"[64] to conclude, as a matter of law, that the *ab initio* requirement was satisfied.[65] The authorities cited above

---

[61] *Id.*

[62] *Id.*

[63] *Id.* at *3. The trial court denied Plaintiff's motion for expedited discovery, concluding that "[t]he controlling stockholder transaction in this case facially followed the *MFW* framework," and that "[t]he plaintiff has not advanced meaningful challenges to that framework." Transcript of Teleconference re: Plaintiff's Motion to Expedite and the Court's Ruling at 18, 20–21 (Feb. 3, 2017) ("But this is a situation where, when I balance things out, you have the *MFW* structure in place; you don't have a meaningful challenge at this stage to the *MFW* structure; and given all that, it does not seem to me to be a situation that warrants cranking up the machinery of expedited proceedings.").

[64] Plaintiff's Corrected Reply Br. at 9.

[65] In assessing the circumstances of this case, I am reminded of Chancellor Allen's observation in *In re Fort Howard Corp.*, 1988 WL 83147, at *12, that:

> [O]ne's view concerning *bona fides,* will, in settings such as this, almost always rest upon inferences that can be drawn from decisions made or courses of actions

23

suggest to me that even if not part of back-and-forth bargaining on price terms, the Davis Polk conflict, the conflict waiver, and management's involvement in the selection of the Committee's advisors during those intervening weeks are substantive events of the type that can impact the functioning and quality of the Committee's work. The bright-line rule we articulated in *M&F Worldwide* would deem the *ab initio* requirement to be satisfied upon including the Dual Protections in the controller's first written offer (here, the January 14 Proposal) and would avoid the factual morass we find ourselves in when intervening events begin to bleed into Committee empowerment and other issues potentially impacting the functioning of the Committee process.[66] Thus, whether these events described in the Proxy were the focus of laser-like attention below is not the main point. Rather, they serve to illustrate why it is sensible to conclude that the Dual Procedural Protections should have been included in the January 14 Proposal and why the bright-line rule set forth in *M&F Worldwide* is preferable.

---

pursued by the board (or a Special Committee). Rarely will direct evidence of bad faith-admissions or evidence of conspiracy-be available. Moreover, due regard for the protective nature of the stockholders' class action, requires the court, in these cases, to be suspicious, to exercise such powers as it may possess to look imaginatively beneath the surface of events, which, in most instances, will itself be well-crafted and unobjectionable. Here, there are aspects that supply a suspicious mind with fuel to feed its flame.

[66] Of course, any test this Court could set forth could be subject to gamesmanship. For example, parties could verbally agree, after a series of discussions, to all material terms and then submit a written proposal embodying "the deal." The trial court would have to retain the ability to address well-pled allegations of deliberate circumvention of the *MFW* Framework.

24

In sum, adhering to a bright-line requirement that the *MFW* Framework be precisely implemented is appropriate in the context of controller squeeze-out transactions where the outset of the process is within the control of the controller. The controller's ability to control the outset justifies insistence on the formalistic requirement of precisely implementing the *MFW* Framework. *M&F Worldwide's* strict and detailed roadmap is particularly appropriate where the courts must address whether the minority stockholders claims should be dismissed before discovery, and in ascertaining which standard of review should apply—as opposed to other contexts where we have eschewed rigid "blueprints."[67] Finally, I am unsympathetic to Defendants' argument that sticking to a bright line rule would potentially punish innocent failures to include the conditions in the controller's first written proposal and thereby disadvantage minority stockholders. The *MFW* Framework was intended to be a clear roadmap in controller buyouts and corporate counsel who routinely practice in the area are familiar with it.[68]

---

[67] *See, e.g.*, *McMillan v. Intercargo Corp.*, 768 A.2d 492, 502 (Del. Ch. 2000) (Strine, V.C.) (stating that the *Revlon* obligation is a "contextually-specific application of the directors' duty to act in accordance with their fiduciary obligations, and there is no single blueprint that a board must follow" (internal quotations omitted)).

[68] After all, we are not talking here about when the autumn leaves turn color, World War II, reading novels, or soccer. *See* Majority Op. at 12–13.