# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE AMTRUST FINANCIAL SERVICES, INC. STOCKHOLDER LITIGATION | )<br>)<br>)<br>) | Consolidated<br>C.A. No. 2018-0396-AGB |

## MEMORANDUM OPINION

Date Submitted: November 5, 2019
Date Decided: February 26, 2020

Ned Weinberger, Thomas Curry, and Mark D. Richardson, LABATON SUCHAROW LLP, Wilmington, Delaware; Jay W. Eisenhofer, Michael J. Barry, and Kyle J. McGee, GRANT & EISENHOFER P.A, Wilmington, Delaware; Marcus E. Montejo, Stephen D. Dargitz, and John G. Day, PRICKETT, JONES & ELLIOTT, P.A, Wilmington, Delaware; Carl L. Stine, Adam J. Blander, and Antoinette Adesanya, WOLF POPPER LLP, New York, New York; Jeremy Friedman, Spencer Oster, and David Tejtel, FRIEDMAN OSTER & TEJTEL PLLC, New York, New York; Eric L. Zagar, Robin Winchester, Michael C. Wagner, and Christopher M. Windover, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania; David Wales and Edward Timlin, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Joseph E. White, III and Adam D. Warden, SAXENA WHITE P.A, Boca Raton, Florida; Steven B. Singer and Joshua Saltzman, SAXENA WHITE P.A, White Plains, New York; *Attorneys for Plaintiffs Arca Investments, a.s., Arca Capital Bohemia, a.s., Krupa Global Investments, Pompano Beach Police & Firefighters' Retirement System, City of Lauderhill Police Officers' Retirement System, West Palm Beach Police Pension Fund, and Cambridge Retirement System.*

Edward B. Micheletti and Bonnie W. David, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Attorneys for Defendants Stone Point Capital LLC, Trident VII Professionals Fund, L.P., Trident VII, L.P., Trident VII DE Parallel Fund, L.P., Trident VII Parallel Fund, L.P, and Trident Pine Acquisition LP.*

Gregory P. Williams, Blake Rohrbacher, Daniel E. Kaprow, and Ryan D. Konstanzer, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Tariq Mundiya and Sameer Advani, WILLKIE FARR & GALLAGHER LLP, New York, New York; *Attorneys for Defendants Donald T. DeCarlo, Susan C. Fisch, Abraham Gulkowitz, and Raul Rivera.*

Daniel A. Mason, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Andrew G. Gordon and William A. Clareman, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; *Attorneys for Defendants Barry D. Zyskind, George Karfunkel, Leah Karfunkel, The Estate of Michael Karfunkel, Evergreen Parent, L.P., K-Z Evergreen, LLC and Evergreen Merger Sub, Inc.*

**BOUCHARD, C.**

This case concerns a transaction in which the controlling stockholders of AmTrust, Inc.—George Karfunkel, Leah Karfunkel, and Barry Zyskind—teamed up with a private equity firm to take AmTrust private through a merger that closed in November 2018. In conveying their initial proposal to acquire the rest of the shares of the company for $12.25 per share, the buyout group conditioned the transaction on receiving the approval of a special committee of the company's board of directors and a majority of AmTrust's minority stockholders.

On February 28, 2018, after negotiating with the buyout group for about seven weeks, the special committee voted to approve a $13.50 per share merger with the buyout group. The proposed merger drew criticism from major stockholders of the company, including Carl Icahn, who sued the controlling stockholders for breach of fiduciary duty and opposed the proposed share price as inadequate. On June 3, 2018, the day before the stockholder meeting scheduled to consider the proposal, the company adjourned the meeting when it became apparent that a majority of the unaffiliated stockholders would not approve the proposal.

On June 4, one day after the company adjourned the ill-fated stockholder meeting, Icahn indicated his willingness to support a transaction at $14.75 per share during discussions with Zyskind and George Karfunkel. The special committee did not participate in these discussions. On June 6, the special committee and the company's board approved an amended merger agreement with a price of $14.75

per share. In connection with amending the merger agreement, Icahn entered into a settlement agreement in which he agreed to drop his lawsuit, support the merger, and forego his appraisal rights. Thereafter, 67.4% of the unaffiliated stockholders of AmTrust approved the amended merger proposal.

Plaintiffs are former stockholders of AmTrust. Their consolidated complaint asserts several claims for breach of fiduciary duty and aiding and abetting against the controlling stockholders, AmTrust's directors, and other participants in the buyout. All of the defendants moved to dismiss the complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief.

The primary issue before the court is whether the transaction complied with the framework set forth in *Kahn v. M & F Worldwide Corp.* ("*MFW*")[1] for subjecting a squeeze-out merger by a controlling stockholder to business judgment review rather than the entire fairness standard. Plaintiffs argue there are many reasons it did not. For the reasons explained below, the court concludes that the transaction did not satisfy the *MFW* standard because the complaint pleads a reasonably conceivable set of facts that three of the four members of the special committee had a material self-interest in the transaction, which was expected to extinguish viable derivative claims exposing each of them to significant personal liability.

---

[1] 88 A.3d 635 (Del. 2014).

The net result of this decision is that the plaintiffs' claims for breach of fiduciary duty against the controlling stockholders and the self-interested members of the special committee will survive, and the court will dismiss the remaining claims for failure to state a claim for relief.

## I.    BACKGROUND

Unless otherwise noted, the facts recited in this opinion are based on the allegations of the Amended Verified Consolidated Class Action Complaint ("Complaint") and documents incorporated therein.[2]   Any additional facts are subject to judicial notice.

### A.    The Players

AmTrust, Inc. ("AmTrust" or the "Company") is a Delaware corporation engaged in the property and casualty insurance businesses.  AmTrust was founded in 1998 by two brothers:  Michael Karfunkel and George Karfunkel.[3]

Plaintiffs in this case are Arca Investments, a.s., Arca Capital Bohemia, a.s., Krupa Global Investments, (collectively, "Arca"), Pompano Beach Police & Firefighters' Retirement System, City of Lauderhill Police Officers' Retirement

---

[2] Am. Verified Compl. ("Compl.") (Dkt. 87).  *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) ("[P]laintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss).

[3] Compl. ¶¶ 48-49.

System, West Palm Beach Police Pension Fund, and Cambridge Retirement System (together, "Plaintiffs"). They each held AmTrust common stock through the closing of the buyout transaction at issue in this action (the "Transaction"), with Arca holding approximately 2.4% of AmTrust's outstanding shares.[4]

Defendant Barry D. Zyskind has served on the Company's board of directors (the "Board") since 1998 and as the Chairman of the Board since May 2016. Zyskind has served as CEO and President of AmTrust since 2000, and serves as an officer and director of AmTrust's many wholly-owned subsidiaries.[5] Zyskind is married to the daughter of co-founder Michael Karfunkel, who died in 2016.

Defendant George Karfunkel has served as a director on the Board since 1998. He is the brother of the Michael Karfunkel.[6] Defendant Leah Karfunkel has served as a director on the Board since May 2016. She is the widow of Michael Karfunkel, the sister-in-law of George Karfunkel, and the mother-in-law of Zyskind.[7]

George Karfunkel, Leah Karfunkel, and Zyskind are referred to together in this opinion as the "K-Z Family." Members of the K-Z Family have controlled

---

[4] *Id.* ¶¶ 43-47.

[5] *Id.* ¶ 48.

[6] *Id.* ¶ 49.

[7] *Id.* ¶ 50.

4

AmTrust since its founding, and owned or controlled approximately 55% of its outstanding shares at the time of the Transaction.[8]

At the times relevant to this action, the Board consisted of seven members: George Karfunkel, Leah Karfunkel, Zyskind, and four others who served on a special committee formed to negotiate the terms of the Transaction (the "Special Committee"). The members of the Special Committee were defendants Donald T. DeCarlo, Abraham Gulkowitz, Susan C. Fisch, and Raul Rivera. DeCarlo and Gulkowitz joined the Board in 2006.[9] Fisch and Rivera joined the Board in 2010 and August 2016, respectively.[10]

To undertake the Transaction, the K-Z Family teamed up with Stone Point Capital LLC ("Stone Point"), a private equity firm, and certain funds that Stone Point manages, namely defendants Trident VII Professionals Fund, L.P., Trident VII, L.P., Trident VII DE Parallel Fund, L.P., and Trident VII Parallel Fund, L.P. The Trident funds participated in the Transaction through defendant Trident Pine Acquisition L.P.[11] This decision refers to Stone Point and these various Trident entities collectively as the "Stone Point Defendants," and to the K-Z Family and the Stone Point Defendants together as the "MBO Group."

---

[8] *Id.* ¶¶ 16, 51.

[9] *Id.* ¶¶ 52, 59.

[10] *Id.* ¶¶ 54, 66.

[11] *Id.* ¶¶ 68-70.

The remaining three defendants in this action, which are referred to collectively as the "Evergreen Entities," served as investment or merger vehicles to effectuate the Transaction: Evergreen Parent, L.P., Evergreen Merger Sub, Inc., and K-Z Evergreen, LLC.[12]

**B.    The Previous Derivative Actions**

In April 2015, Cambridge Retirement System, an AmTrust stockholder, filed a derivative action in this court on behalf of AmTrust (the "Cambridge Action"). The Cambridge Action included claims against the members of the K-Z Family and four outside directors (DeCarlo, Fisch, Gulkowitz, and Jay J. Miller) "for breaching their fiduciary duties of loyalty and usurping a corporate opportunity from AmTrust in connection with the Company's and the Karfunkel-Zyskind Family's dealings with insurance company Tower Group International, Ltd."[13]

All of the defendants in the Cambridge Action except Miller answered the complaint in lieu of filing a motion to dismiss.[14] Miller retired from the Board before the events relevant to this case. In denying his motion to dismiss in the Cambridge Action, the court commented that the core allegations of the complaint were "very

---

[12] *Id.* ¶¶ 71-74.

[13] *Id.* ¶ 97.

[14] *Cambridge Ret. Sys. v. DeCarlo*, Del. Ch., C.A. No. 10879-CB, Dkts. 39, 42, 43, 45.

6

troubling" and "describe a very unusual set of circumstances" concerning the approval of a conflicted transaction.[15]

In May and June 2017, AmTrust stockholders filed two derivative actions in the United States District Court for the District of Delaware, which the district court consolidated. The complaint asserts claims for "violations of Sections 10(b), 20A, and 29(b) of the Securities Exchange Act, breaches of fiduciary duties, unjust enrichment, and corporate waste" against AmTrust's management and Board, including Rivera.[16]

The district court action was filed in response to various alleged disclosure violations, including "restatements of multiple years of the Company's financials stemming from issues with its financial reporting, increases in the Company's loss reserves, and the public revelation of a long-running SEC investigation."[17] According to the Complaint, this series of negative disclosures caused AmTrust's stock price to fall by more than 50% in the year before the Transaction, from $27 in the first quarter of 2017 to $13 at the end of the third quarter of 2017.[18]

---

[15] Cambridge Action, Mot. to Dismiss Hr'g Tr. ("Cambridge Action Tr.") 46, 47 (Dkt. 82).

[16] Konstanzer Aff. Ex. 31, at 10.

[17] Compl. ¶ 167.

[18] *Id.*

7

## C. The K-Z Family Sets the Stage for the Transaction

In early May 2017, there were reports that the K-Z Family would seek to take the Company private.[19] The K-Z Family denied the reports at the time.[20]

On May 8, 2017, Zyskind told investors on an earnings call that the Company was "exploring several ways to monetize the value of [AmTrust's] fee business" and that the Company was seeking to sell a 51% stake to a "private equity-like partner."[21] Later that summer, AmTrust issued 24,096,384 shares of common stock to members of the K-Z Family through a private placement at $12.45 per share, increasing their ownership of the outstanding shares of common stock from 49% to 55%.[22]

Sometime in September 2017, Stone Point initiated discussions with Zyskind regarding a potential take-private transaction, but the discussions did not progress.[23]

On November 6, 2017, AmTrust announced it would sell 51% of its fee business to Madison Dearborn Partners.[24] On November 9, 2017, the credit rating agency A.M. Best announced that AmTrust was "under review with negative implications until: (1) the Fee Business Sale closed, and A.M. Best assessed the

---

[19] *Id.* ¶ 203.

[20] *Id.* ¶ 191.

[21] *Id.* ¶ 206.

[22] *Id.* ¶¶ 51, 204.

[23] *Id.* ¶ 210.

[24] *Id.* ¶ 337; Konstanzer Aff. Ex. 1 ("Proxy"), at 22 (Dkt. 94).

transaction's impact on risk-adjusted capital; and (2) the Company's annual report on Form 10-K for fiscal year 2017 . . . was filed."[25] That same month, the Company's Form 10-Q stated that AmTrust's $13.46 stock price at the end of the third quarter of 2017 was well below its "fair value" and its recent "share price decline . . . is relatively short-term in nature."[26]

### D.    The Initial Take-Private Proposal

On November 16, 2017 Zyskind informed the Board that "the Company had begun to receive unsolicited calls from potential investors," and that "senior management was in the process of negotiating non-disclosure agreements with certain parties so they could commence due diligence and have discussions with Company management."[27] At this meeting, "various alternative transactions were discussed, including not only a going-private transaction, but also 'a significant investment from an unrelated third party or possibly a combination of a third party investor with the Karfunkel and Zyskind families participating.'"[28] On November 17, 2017, Stone Point entered into a confidentiality agreement with the Company.[29]

---

[25] Compl. ¶¶ 215, 217.

[26] *Id.* ¶ 27.

[27] *Id.* ¶ 218.

[28] *Id.* ¶ 219.

[29] *Id.* ¶ 221; Proxy at 22.

On December 27, 2017, Zyskind asked the Board to grant Stone Point, "who he and the Karfunkel Family have known . . . for many years," a waiver under 8 *Del. C.* § 203 to allow it to discuss a joint proposal with the K-Z Family (the "Waiver").[30] The K-Z Family's lawyers, Paul, Weiss, Rifkind, Wharton and Garrison LLP, then advised the Board on "the requirements for the Waiver."[31]

On December 29, 2017, the Board formed a limited special committee comprised of DeCarlo, Fisch, Gulkowitz, and Rivera to consider the Waiver.[32] On January 8, 2018, the limited special committee granted the Waiver, allegedly for no consideration.[33]

On January 9, 2018, Stone Point and the K-Z Family entered into a joint bidding agreement.[34] That same day, the MBO Group made a confidential presentation to a ratings agency, disclosing that they intended to make an offer to take AmTrust private.[35] After the presentation, the MBO Group made their initial proposal to the Board for them to acquire all outstanding shares of common stock unaffiliated with the K-Z Family for $12.25 per share in cash,[36] conditioned "on

---

[30] Compl. ¶ 230-31.

[31] *Id.*

[32] *Id.*¶ 233.

[33] *Id.* ¶ 234.

[34] *Id.* ¶ 252.

[35] *Id.* ¶ 238.

[36] *Id.* ¶ 243.

approval by an independent special committee and a fully informed majority of AmTrust's minority stockholders."[37] The initial proposal also stated that the K-Z Family had no interest in selling any of their shares of AmTrust:

> [T]he Family Stockholders have no interest in selling any of the shares of common stock of AmTrust owned or controlled by them. As such, the Family Stockholders would not expect, in their capacity as stockholders of AmTrust, to vote in favor of any alternative sale, merger or similar transaction involving AmTrust. If the special committee does not recommend, or the stockholders of AmTrust do not approve, the proposed transaction, the Family Stockholders currently intend to continue as long-term stockholders of AmTrust.[38]

Also on January 9, 2018, the Board formed the Special Committee to negotiate and evaluate the initial proposal.[39] The Special Committee retained Willkie Farr & Gallagher LLP as its legal counsel and Deutsche Bank as its financial advisor. According to the Complaint, the Special Committee retained Deutsche Bank before reviewing any conflicts of interest.[40]

---

[37] *Id.* ¶ 244.

[38] *Id.*

[39] *Id.* ¶¶ 239, 249.

[40] *Id.* ¶ 242; *see also id.* ¶¶ 325-27 (alleging conflicts of interests Deutsche Bank had based on prior work it performed for Stone Point, AmTrust, and their respective affiliates).

11

**E.	The Negotiation Process**[41]

On January 16, 2018, the Special Committee met to evaluate the MBO Group's proposal. According to the proxy statement for the Transaction (the "Proxy"), the Special Committee determined that projections that had been prepared based on the Company's ordinary course annual budgeting and planning process "were no longer current, and that updated projections from Company management would be necessary."[42]

The next week, AmTrust management provided the Special Committee and Deutsche Bank with a new set of financial projections (the "Case 1 Projections"). According to the Proxy, "the Case 1 Projections were inconsistent with financial analysts' consensus estimates for the Company and the Company's peer group," and "did not appear to reflect certain adverse industry trends and Company issues discussed with the Company management at a January 23, 2018 Audit Committee meeting."[43] DeCarlo thus requested another set of projections. On January 31, 2018, AmTrust management delivered the lower projections (the "Case 2 Projections") to the Special Committee.[44]

---

[41] With respect to the Special Committee's process, the Complaint points out a number of discrepancies in the description of events in the Company's minutes versus the Proxy. *See* Compl. ¶¶ 277, 281, 305.

[42] *Id.* ¶¶ 275-77.

[43] *Id.* ¶ 280.

[44] *Id.* ¶ 282.

12

On February 8, 2018, the Special Committee communicated a counter-proposal at $17.50 per share. Between February 14 and 18, the Special Committee met with the MBO Group and then Company management to discuss their views on the Company's financial position and the effect any potential going-private transaction could have on the Company's rating by A.M. Best.[45] Shortly thereafter, the Special Committee requested a third set of financial projections (the "Special Committee Case Projections").[46] The same day it received the Special Committee Case Projections, which were lower than the Case 2 Projections, the Special Committee revised its counteroffer to $15.10 per share, despite receiving no formal rejection of the $17.50 per share offer.[47]

During a meeting on February 16, 2018, DeCarlo informed the Special Committee that he was recusing himself "from all discussions and decisions made by the Special Committee in respect of the Cambridge [Action]" as a result of his "involvement" in that litigation.[48]

On February 23, 2018, the MBO Group rejected the $15.10 counteroffer and increased its offer to $13.00 per share.[49] The MBO Group also rejected the inclusion

---

[45] *Id.* ¶¶ 289-92.

[46] *Id.* ¶ 292.

[47] *Id.* ¶ 293.

[48] *Id.* ¶ 383.

[49] *Id.* ¶ 293.

13

of a "go shop" and a voting agreement requiring the K-Z Family to vote in favor of a superior proposal.[50]

On February 25, 2018, the Special Committee asked to review the Company's current draft of its 2017 10-K, which was going to be filed late, and requested another set of financial projections based on the scenario that the Company's rating would be downgraded by A.M. Best.[51] On February 26, 2018, the Special Committee made a counteroffer of $14.00 per share.[52]

According to the Proxy, the MBO Group made a counteroffer of $13.50 to the Special Committee later on February 26, 2018.[53] The Proxy also states that the Special Committee "resolved to approve and adopt the Special Committee Case Projections" on February 26, and directed Deutsche Bank to use these projections in its financial analysis.[54]

On February 28, 2018, Deutsche Bank provided a presentation to the Special Committee that referenced a "contingent litigation asset (based on upper end of Willkie [Farr] estimate)" worth between $15 million and $25 million.[55] This was

---

[50] *Id.*

[51] *Id.* ¶¶ 294-95.

[52] *Id.* ¶¶ 302-03.

[53] *Id.* ¶ 305.

[54] *Id.* ¶ 306.

[55] *Id.* ¶ 388.

the first time a value for the Cambridge Action was discussed with the Special Committee.

Later on February 28, the Special Committee recommended that the Board approve the MBO Group's $13.50 offer, which it did that evening.[56] On March 1, 2018, AmTrust announced that it had entered into the merger agreement.[57]

### F. The Transaction Negotiated by the Special Committee Fails to Obtain the Support of the Public Stockholders

The $13.50 per share proposal that the Special Committee negotiated was met with opposition by major stockholders, including Carl Icahn, who held more than 9.3% of the Company's outstanding shares and had started soliciting proxies to oppose the transaction.[58] According to Icahn, "management's *own claim* that the Company expected a future return on operating equity of 12–15% implied a valuation significantly higher than $13.50 per share based on the Company's book value per share as of March 31, 2018," and another analysis suggested that the shares should trade at "a price of $26.06 to $31.86 per share."[59] On May 21, 2018, Arca

---

[56] *Id.* ¶¶ 317-18.

[57] *Id.* ¶ 321.

[58] *Id.* ¶ 364.

[59] *Id.* ¶¶ 368-69.

also announced its opposition to the $13.50 per share proposal that the Special Committee had negotiated.[60]

On May 25, 2018, Institutional Shareholder Services ("ISS") criticized the Special Committee's "less-than-robust sale process," and recommended voting against the $13.50 per share proposal because "a standalone scenario seems to be a preferable alternative to the currently proposed transaction."[61] ISS suggested that a valuation range between $14.35 and $20.82 per share was more appropriate.[62]

On June 3, 2018, "a preliminary assessment of proxies received by . . . the Company's proxy solicitor" showed that a majority of the public stockholders would not support the $13.50 per share proposal.[63] Also on June 3, the Company adjourned the special meeting of stockholders scheduled for the next day to consider the $13.50 proposal.[64]

### G. The Public Shareholders Approve a Revised Transaction

On June 4, 2018, during a meeting with Zyskind, George Karfunkel, and the Company's financial and legal advisors, Icahn informed them that he would support

---

[60] *Id.* ¶ 372.

[61] *Id.* ¶ 374.

[62] *Id.*

[63] *Id.* ¶ 400 & n.37; Konstanzer Aff. Ex. 2 ("Proxy Supp.") at S-5 (Dkt. 94).

[64] Compl. ¶ 400 n.37.

a transaction at $14.75 per share.[65] Later that evening, Zyskind informed Icahn that he was prepared to increase the price to $14.75 per share subject to Icahn entering into a satisfactory support agreement.[66] The Special Committee was not part of these discussions.[67]

On June 6, 2018, after the merger agreement was amended to a price of $14.75 per share, the Special Committee and the Board approved the revised transaction.[68] On June 7, 2018, the Company announced that it had entered into an amendment whereby the MBO Group increased its offer from $13.50 to $14.75 per share.[69] In connection with the amendment, Icahn entered into a settlement in which he agreed to support the Transaction, dismiss his breach of fiduciary duty action, and forego any appraisal rights.[70]

On June 21, 2018, the Company reconvened the special meeting of stockholders to vote on the adoption of the amended merger agreement. It was approved by 67.4% of the unaffiliated stockholders.[71]

---

[65] *Id.* ¶ 396 n.36; Proxy Supp. at S-6.

[66] Compl. ¶ 396 n.36; Proxy Supp. at S-6.

[67] Compl. ¶ 396 n36; Proxy Supp. at S-6.

[68] Compl. ¶ 8; Proxy Supp. at S-6.

[69] Compl. ¶ 396.

[70] *Id.*

[71] *Id.* ¶ 400.

## H. The A.M. Best Downgrade

On July 3, 2018, A.M. Best downgraded the financial strength of AmTrust's insurance companies from an "A" to "A-."[72] A.M. Best noted that "[t]he rating actions reflect AmTrust's balance sheet strength, which A.M. Best categorizes as very strong."[73] A.M. Best also noted that "[t]he recently approved plan under which [AmTrust] will be privatized has a neutral impact on the rating."[74] After A.M. Best announced the downgrade, the MBO Group stated that it would not be asserting its right to terminate the Transaction due to the ratings downgrade, which it had specifically negotiated for in the merger agreement.[75]

On August 9, 2018, AmTrust issued its second quarter Form 10-Q, which stated the following concerning the A.M. Best downgrade:

> Although a ratings downgrade occurred, A.M. Best categorizes our balance sheet as very strong with a high-quality capital profile. In addition, our risk-adjusted capitalization, as measured by A.M. Best's Capital Adequacy Ratio (BCAR) strengthened materially through the first quarter of 2018. From a credit strength perspective, we are not aware of any significant implications to our business as a consequence of the downgrade, and do not believe it has materially impacted our access to the capital markets. We are not aware of any significant loss of business or change in business mix related to this event. The downgrade had no impact on any of our debt covenants or credit facilities, as we did not fall below any minimum credit rating requirements.

---

[72] *Id.* ¶ 401.

[73] *Id.*

[74] *Id.* ¶ 402.

[75] *Id.* ¶ 403; Proxy at 38.

On November 29, 2018, the Transaction closed.[76] The closing of the Transaction eliminated Plaintiffs' standing to maintain the Cambridge Action,[77] which the parties dismissed by stipulation on January 30, 2019.[78]

## II. PROCEDURAL HISTORY

From May 2018 to February 2019, Plaintiffs filed three separate class action complaints challenging the Transaction, which the court consolidated.[79] On May 8, 2019, Plaintiffs filed the Amended Verified Consolidated Class Action Complaint (as defined above, the "Complaint").

The Complaint asserts four claims. Count I asserts that the "Director Defendants breached their fiduciary duties by supporting and/or acquiescing to the Transaction that greatly undervalued AmTrust and provided consideration to AmTrust's minority stockholders that was grossly unfair."[80] Count II asserts that Zyskind breached his fiduciary duty as an officer "by placing his own interests ahead

---

[76] Compl. ¶ 408.

[77] *See In re Massey Energy Co. Deriv. & Class Action Litig.*, 160 A.3d 484, 497-98 (Del. Ch. 2017) ("[I]t has been a matter of well-settled Delaware law for over three decades that stockholders of Delaware corporations must hold shares not only at the time of the alleged wrong, but continuously thereafter throughout the litigation in order to have standing to maintain derivative claims, and will lose standing when their status as stockholders of the company is terminated as a result of a merger . . . .") (citing *Lewis v. Anderson*, 477 A.2d 1040 (Del. Ch. 1984)).

[78] Cambridge Action, Dkt. 227.

[79] Dkts. 56, 86.

[80] Compl. ¶ 451.

of those of AmTrust's public stockholders. . . . [and] orchestrating a deal that guaranteed that AmTrust's insiders would take the Company private at an artificially low price. . . ."[81]   Count III asserts that Zyskind, George Karfukel, and Leah Karfunkel breached their fiduciary duties as controlling stockholders by "manipulat[ing] and control[ing] the Transaction process, including the Company's financial projections and the valuation process used by the conflicted Special Committee."[82]   Count IV asserts that the Stone Point Defendants "aided and abetted the Director Defendants and Zyskind as an officer defendant, in the aforesaid breach of their fiduciary duties."[83]

In June 2019, each of the Defendants moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief as to each of them.  After briefing, the court held oral argument on November 5, 2019.

## III.   ANALYSIS

The standards governing a motion to dismiss under Rule 12(b)(6) for failure to state a claim for relief are well settled:

---

[81] *Id.* ¶ 457.

[82] *Id.* ¶¶ 460, 470.

[83] *Id.* ¶¶ 475-78.

(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[84]

Defendants' briefs are lengthy but they raise essentially four issues. First, should the Transaction be subject to business judgment review under the framework our Supreme Court articulated in *MFW*?[85] Second, if the *MFW* standard is not satisfied, does the Complaint state a non-exculpated claim for breach of fiduciary duty against each of the Special Committee members in accordance with the test set forth in *In re Cornerstone Therapeutics Inc, Stockholder Litigation*?[86] Third, does the Complaint state a claim for breach of fiduciary duty against Zyskind as an officer of the Company? Fourth, does the Complaint state a claim for aiding and abetting against the Stone Point Defendants? The court addresses each issue in turn below.[87]

---

[84] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal quotations and citations omitted).

[85] 88 A.3d 635.

[86] 115 A.3d 1173 (Del. 2015).

[87] The K-Z Family asserts that the court should dismiss the Evergreen Entities because the Complaint "does not assert any claims against them." K-Z Family Opening Br. ¶ 15 (citing *Chester Cty. Ret. Sys. v. Collins*, 2016 WL 7117924, at *3, ¶ 12 (Del. Ch. Dec. 6, 2016) (ORDER) (granting motion to dismiss), *aff'd*, 165 A.3d 286 (Del. 2017) (TABLE)) (Dkt. 99). The court agrees. None of the counts in the Complaint are directed against the Evergreen Entities, *see* Compl. ¶¶ 449-78, and Plaintiffs made no effort to explain why they should not be dismissed. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.") (citations omitted); *see also Brinckerhoff v.*

21

## A. Defendants' *MFW* Defense

In *MFW*, our Supreme Court held that the business judgment rule is the appropriate standard of review for a challenge to a squeeze-out merger by a controlling stockholder if the transaction satisfies certain procedural protections:

> We hold that business judgment is the standard of review that should govern mergers between a controlling stockholder and its corporate subsidiary, where the merger is conditioned *ab initio* upon both the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; and the uncoerced, informed vote of a majority of the minority stockholders.[88]

In so holding, the high court reasoned that the "simultaneous deployment of [these] procedural protections . . . create a countervailing, offsetting influence of equal—if not greater—force" than the undermining influence of a controller.[89] The high court further explained that the dual protections of special committee review and approval of a majority of the minority stockholders are "consistent with the central tradition of Delaware law, which defers to the informed decisions of impartial directors, especially when those decisions have been approved by the disinterested stockholders on full information and without coercion."[90] Although *MFW* itself was

---

*Enbridge Energy Co., Inc.*, 2012 WL 1931242, at *1 (Del. Ch. May 25, 2012), *aff'd*, 67 A.3d 369 (Del. 2013). Accordingly, the Evergreen Entities will be dismissed.

[88] 88 A.3d at 644.

[89] *Id.*

[90] *Id.*

22

decided after discovery on a motion for summary judgment, courts have applied its framework at the pleadings stage as well.[91]

In *Flood v. Synutra International, Inc.*, our Supreme Court addressed some "confusing dicta in *MFW*" to clarify that the focus of the inquiry is on process, not price.[92] Specifically, the high court explained that its previous affirmance of the Court of Chancery's decision in *Swomley v. Schecht* "eliminat[ed] any ambiguity created by *MFW* and confirm[ed] that a plaintiff can plead a duty of care violation only by showing that the Special Committee acted with gross negligence, not by questioning the sufficiency of the price."[93]

Plaintiffs assert that the *MFW* framework does not apply to the Transaction because it "was not negotiated by a Special Committee and approved by minority stockholders."[94] From Plaintiffs' perspective, "[t]he Special Committee's work"— which yielded a proposed transaction for $13.50 per share—"was rejected by minority stockholders" and the Transaction that the minority stockholders did approve—for $14.75 per share—was "negotiated directly between Icahn and the K-

---

[91] *See In re Books-A-Million Inc. S'holders Litig.*, 2016 WL 5874974 (Del. Ch. Oct. 10, 2016), *aff'd*, 164 A.3d 56 (Del. 2017) (TABLE); *Swomley v. Schlecht*, C.A. No. 9355–VCL (Del. Ch. Aug. 27, 2014) (TRANSCRIPT), *aff'd*, 128 A.3d 992 (Del. 2015) (TABLE).

[92] 195 A.3d 754, 767 (Del. 2018).

[93] *Id.* at 768.

[94] Pls.' Answering Br. 51.

23

Z Family without any involvement by the Special Committee" as their negotiating agent.[95] This is significant, according to Plaintiffs, not only because Icahn (rather than the Special Committee) was responsible for the transaction on which the stockholders actually voted, but because Icahn had no access to non-public information about the Company, owed no fiduciary duty to AmTrust's other stockholders, and had his own short-term motivations to bump the price and sell his shares quickly. Plaintiffs' argument seems to find support in *Synutra*, where the high court emphasized that "the entire point of the *MFW* standard is to recognize the utility to stockholders of replicating the two key protections that exist in a third-party merger: an independent negotiating agent *whose work* is subject to stockholder approval."[96]

Defendants counter that *MFW* does not require that "every aspect of the challenged transaction be negotiated by the Special Committee" and, even if it did, "the Special Committee remained involved in the negotiations with the [MBO] Group and approved the subsequent increase to the deal price."[97] Defendants further contend that "the fundamental policy underlying *MFW* does not exclude—and, in fact, welcomes—the notion that price bumps may be due to both the Special

---

[95] *Id.* 51-52.

[96] 195 A.3d at 766-76 (emphasis added).

[97] Special Committee Reply Br. 4-5 (Dkt. 123).

24

Committee's negotiations and the unaffiliated stockholders' veto power" and that the price bump Icahn extracted "is proof that *MFW* worked—not the opposite."[98] Although the parties have identified an interesting and seemingly novel question, the court need not resolve it, at least at this time, because Plaintiffs have pled sufficient facts to demonstrate that at least one of the conditions of the *MFW* standard has not been satisfied.

In summarizing its holding, the Supreme Court in *MFW* identified six conditions that must be satisfied to invoke business judgment review of a squeeze-out merger by a controlling stockholder:

> [I]n controller buyouts, the business judgment standard of review will be applied *if and only if*: (i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders; (ii) the Special Committee is independent; (iii) the Special Committee is empowered to freely select its own advisors and to say no definitively; (iv) the Special Committee meets its duty of care in negotiating a fair price; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority.[99]

"If a plaintiff can plead a reasonably conceivable set of facts showing that any or all of those enumerated conditions did not exist," the plaintiff would state a claim for relief and be entitled to conduct discovery.[100] "If, after discovery, triable issues of

---

[98] *Id.* 6-7.

[99] *MFW*, 88 A.3d at 645 (formatting altered), *overruled on other grounds by Synutra*, 195 A.3d 754.

[100] *Id.*

25

fact remain about whether either or both of the dual procedural protections were established, or if established were effective, the case will proceed to a trial in which the court will conduct an entire fairness review."[101]

Plaintiffs contend that the last five of the six conditions enumerated in *MFW* have not been satisfied here. As just discussed, the court need not address each of these contentions because the failure to comply with a single condition is sufficient to defeat reliance on the *MFW* standard. For the reasons discussed next, the court concludes that Plaintiffs have pled a reasonably conceivable set of facts that the second condition has not been satisfied based on the Complaint's allegations that three of the four members of the Special Committee had a material self-interest in the Transaction.

Before addressing Plaintiffs' factual allegations, it bears mention that the second *MFW* condition speaks in terms of the "independence" of members of a special committee. In my opinion, however, this condition—and the overall *MFW* framework—was intended to ensure not only that members of a special committee must be *independent* in the sense of not being beholden to a controlling stockholder,

---

[101] *Id.* at 645-46.

26

but also that the committee members must have no disabling personal *interest* in the transaction at issue.[102]

It is well established under Delaware law that directors are interested in a transaction if they "expect to derive any personal financial benefit" from the transaction "as opposed to a benefit which devolves upon the corporation or all stockholders generally."[103] In the absence of self-dealing, for the interest of a director to be disabling, the "benefit must be alleged to be *material* to that director."[104]

Plaintiffs argue that "each of DeCarlo, Fisch, and Gulkowitz was interested in the Transaction because it extinguished potential liability in the Cambridge Action."[105] Relying on *In re Riverstone National, Inc. Shareholder Litigation*, Plaintiffs argue that the relevant inquiry in this context is whether the pled facts demonstrate that the directors "were aware that they faced a derivative claim at the

---

[102] *See Orman v. Cullman*, 794 A.2d 5, 23-24 (Del. Ch. 2002) (discussing the separate issues of independence and interestedness).

[103] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (citations omitted).

[104] *Orman*, 794 A.2d at 23 (citing *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 363 (Del. 1993)).

[105] Pls.' Answering Br. 60. Plaintiffs contend that for *MFW* to apply, "*all* members of the Special Committee must have been disinterested and independent." *Id.* at 59. Given that the court finds that a majority of the members of the Special Committee had a material self-interest in the Transaction, it is not necessary to address this argument.

27

time they were considering the [Transaction], that the claim was viable, and that potential liability was material to [the directors]."[106]

In *Riverstone*, plaintiffs argued "that by orchestrating a merger that extinguished a possible derivative action, the Director Defendants obtained a special benefit for themselves, and were thus interested in the transaction."[107] In addressing this argument, Vice Chancellor Glasscock cautioned that "much ground for strike suits and other mischief would be possible" if the court were to endorse the theory based on "a conclusory allegation," but found the argument to be persuasive where plaintiffs had:

> plead particularized facts with respect to individual directors showing the existence of a chose-in-action against the directors which, if brought as a claim would have survived a motion to dismiss; that the director at the time of negotiating and recommending the merger was aware of the potential action; that the potential for liability was material to the director; and that the directors obtained and recommended an agreement that extinguished the claim directly by contract.[108]

Although the court shares Vice Chancellor Glasscock's concern for caution, *Riverstone* sets forth an appropriate framework in my opinion to evaluate Plaintiffs' argument that the second *MFW* condition has not been satisfied.

---

[106] 2016 WL 4045411, at *15 (Del. Ch. July 28, 2016).

[107] *Id.* at *8.

[108] *Id.*

28

Significantly, Defendants do not challenge (i) that DeCarlo, Fisch, and Gulkowitz were aware that they faced a derivative claim in the Cambridge Action when they were considering whether to approve the Transaction, (ii) that the claim was viable, or (iii) that the potential liability they faced was material to each of them personally.[109] Nor could they credibly do so.

DeCarlo, Fisch, and Gulkowitz (and all the other defendants in the Cambridge Action except Miller) tacitly conceded the viability of the claims against them by answering Cambridge's complaint in lieu of making a pleadings stage motion.[110] In denying Miller's motion to dismiss, furthermore, the court found that the core allegations of the complaint in the Cambridge Action, which concerned the approval of a conflicted transaction, were "very troubling" and "very unusual."[111]

As to the materiality of the derivative claim, the Complaint alleges that (i) Cambridge's expert valued the claim to be worth "in excess of $300 million" and

---

[109] To be clear, Defendants do challenge the materiality of the potential liability in the Cambridge Action relative to the $2.95 billion value *of the Transaction*. This comparison is relevant to the inquiry addressed in *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455 (Del. Ch. 2013), which considers whether a stockholder whose standing to pursue a derivative claim was extinguished by a merger nevertheless may challenge the merger directly based on the target board's failure to obtain sufficient value for the derivative claim. In that scenario, "the value of the derivative claim must be material in the context of the merger." *Id.* at 477. Here, the question is simply whether the special committee members had a material self-interest in approving the merger. The relevant focus in this scenario is whether the potential liability in the Cambridge Action was material to those directors personally.

[110] Cambridge Action, Dkts. 39, 42, 43, 45.

[111] Cambridge Action Tr. 46-48.

29

(ii) the Special Committee's financial advisor (Deutsche Bank) informed the Special Committee that the estimated "net settlement value" of the claim was "between $15 million and $25 million."[112] It certainly is reasonably conceivable that the prospect of joint and several liability for a claim with a settlement value in this range—from which it is reasonable to infer the amount of the exposure was much higher—would be material to DeCarlo, Fisch, and Gulkowitz personally.[113]

The Special Committee members attempt to distinguish *Riverstone* on its facts because, unlike in that case, the Plaintiffs here do not allege that "the merger agreement the directors obtained and recommended . . . eliminated *any* pursuit of the matter as a corporate asset purchased by the acquirer, as a matter of contract."[114] This distinction does not make a substantive difference in my view.

*Riverstone* involved a merger with a third party, Greystar Real Estate Partners, LLC, in which Riverstone's stockholders were cashed out and control of the company transferred to Greystar.[115] In this context, a contractual release of claims against the former Riverstone directors who had been accused of usurping a

---

[112] Compl. ¶¶ 379, 388; Special Committee Opening Br. 27.

[113] *See Orman*, 794 A.2d at 31 ("I think it would be naïve to say, as a matter of law, that $3.3 million is immaterial.") (finding it "reasonable to infer" director "suffered a disabling interest when considering how to cast his vote in connection with the challenged merger when the Board's decision on that matter could determine whether or not his firm would receive $3.3 million").

[114] Special Committee Reply Br. 30 (quoting *Riverstone*, 2016 WL 4045411, at *1).

[115] *Riverstone*, 2016 WL 4045411, at *5.

corporate opportunity would be important to the directors because, post-merger, the company and the fate of the claims would be in the hands of a third party with no exposure to the claims.

Here, by contrast, the Transaction involves a squeeze-out merger in which AmTrust's controlling stockholders (the K-Z Family)—who are the focus of the usurpation claim at the heart of the Cambridge Action—retained control of the Company when they took it private. In this context, the absence of a contractual release of claims would be of little, if any, importance to DeCarlo, Fisch, or Gulkowitz because it stands to reason that, post-merger, the K-Z Family would never press claims relating to their own alleged usurpation of a corporate opportunity.

In sum, for the reasons stated above, the court concludes that Plaintiffs have pled a reasonably conceivable set of facts showing that each of the conditions necessary to apply the *MFW* framework to subject the Transaction to business judgment review have not been satisfied.[116] Accordingly, subject to the court's

---

[116] In a footnote, Defendants argue that, "[s]hould the Court decline to dismiss the Complaint under *MFW*, the Court should shift the burden of persuasion to Plaintiffs." Special Committee Opening Br. 61 n.18. The basis for this request is that the presence of either of the two procedural protections upon which *MFW* is premised (*i.e.*, a functioning special committee of independent directors or approval of an informed and uncoerced vote of a majority of the unaffiliated stockholders) would shift the burden of persuasion on the issue of fairness. *See MFW*, 88 A.3d at 642 (citing *Kahn v. Lynch Comm'n Sys., Inc.*, 638 A.2d 1110. 1117 (Del. 1994)). Although a burden shift ultimately may be appropriate in this case, it would be premature to shift the burden of persuasion at this stage, before discovery has been completed.

31

disposition of the Special Committee defendants' motion to dismiss under *Cornerstone*, which is discussed in the next section, Counts I and III of the Complaint state claims for relief for which Plaintiffs are entitled to take discovery.[117]

## B.    The Special Committee Defendants' *Cornerstone* Defense

In addition to relying on *MFW*, the Special Committee defendants argue that the court should dismiss them from this action because the Complaint fails to allege a non-exculpated claim for breach of fiduciary duty against them.

The Special Committee defendants are protected by a Section 102(b)(7) provision in Amtrust's certificate of incorporation.[118]  As our Supreme Court explained in *Cornerstone*, "[w]hen a director is protected by an exculpatory charter provision, a plaintiff can survive a motion to dismiss by that director defendant by pleading facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an

---

[117] *MFW*, 88 A.3d at 645 ("If a plaintiff that can plead a reasonably conceivable set of facts showing that any or all of those enumerated conditions did not exist, that complaint would state a claim for relief that would entitle the plaintiff to proceed and conduct discovery.").

During oral argument, Defendants argued for the first time that even if the court concludes that *MFW* does not apply, the court should prohibit Plaintiffs from challenging the value the Special Committee attributed to the Cambridge Action as part of their direct challenge to the overall fairness of the Transaction.  Mot. to Dismiss Hr'g Tr. 56 (November 5, 2019) (Dkt. 129).  Defendants did not fairly present this argument during briefing and thus the court declines to impose any such limitation at this time.

[118] *See* Konstanzer Aff. Ex. 33 Art. XI (Dkt. 95); *see also McMillan v. Intercargo Corp.*, 768 A.2d 492, 501 n.40 (Del. Ch. 2000) (noting the court may take judicial notice of the Company's certificate of incorporation).

interested party from whom they could not be presumed to act independently, or acted in bad faith."[119]

For the reasons discussed above, Plaintiffs have pled facts supporting a rational inference that DeCarlo, Fisch, and Gulkowitz harbored self-interest adverse to the interests of Amtrust's minority stockholders when they approved the Transaction because, as a practical matter, it would have extinguished viable claims against each of them for which they faced significant potential liability. Accordingly, the motion to dismiss Count I for failure to state a non-exculpated claim for breach of fiduciary duty is denied as to these three individuals.

The fourth member of the Special Committee, Rivera, is situated differently than its other three members. Rivera joined the Board in August 2016, almost two years after the transaction challenged in the Cambridge Action closed, and was not named as a defendant in the Cambridge Action.[120] Plaintiffs do not allege that Rivera had a material self-interest in the Transaction. Nor do they allege facts challenging Rivera's independence. Given the absence of any such allegations, Plaintiffs' claim against Rivera turns on whether the Complaint alleges sufficient facts from which it is reasonably conceivable he acted in bad faith.

---

[119] 115 A.3d at 1179-80.

[120] Compl. ¶¶ 66, 154.

33

To support an assertion of bad faith, Plaintiffs must plead facts demonstrating that Rivera "intentionally fail[ed] to act in the face of a known duty to act, demonstrating a conscious disregard for [his] duties."[121] Plaintiffs have not done so.

There are few allegations in the Complaint specifically about Rivera. Lumping him together with the other three members of the Special Committee, Plaintiffs argue through group pleading that he acted in bad faith because the Special Committee defendants (i) sought downward projections, (ii) failed to engage actively in the sale process with Icahn, and (iii) knew the Proxy was materially misleading. As to each of these acts or omissions, however, Plaintiffs' allegations are conclusory and do not provide factual support that rises to the level of bad faith.

With respect to the disclosures in the Proxy, for example, Plaintiffs state that the Special Committee members "knew language in the Proxy was materially misleading"[122] but they provide no factual support to backup this assertion, much less to suggest that Rivera intended to disregard his obligation to ensure that the Company disclosed all material information to its stockholders. To be sure, the series of revisions to the Company's projections in the midst of negotiations with the MBO Group and the Special Committee's lack of involvement with Icahn and

---

[121] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) (citation and internal quotations omitted).

[122] Pls.' Answering Br. 88.

34

members of the K-Z Family as they separately discussed a price increase, raise significant questions about the process that the Special Committee undertook and its effectiveness. Plaintiffs have failed, however, to allege facts concerning these matters that rise to the level of bad faith on the part of the Special Committee members, including Rivera.

\* \* \* \* \*

For the reasons discussed above, the motion to dismiss Count I is denied as to DeCarlo, Fisch, and Gulkowitz, but granted as to Rivera.

## C. The Claim Against Zyskind in his Capacity as an Officer

Count II of the Complaint asserts that Zyskind, in his capacity as an AmTrust officer, "breached his fiduciary duties by placing his own interests ahead of those of AmTrust's public stockholders."[123] The K-Z Family defendants argue that the court should dismiss this claim because Zyskind "is not alleged to have taken any actions in his capacity as an officer that would constitute a breach of his fiduciary duties to the Company's stockholders."[124]

Although the Complaint repeatedly refers to AmTrust management in describing the negotiation process, it does not contain allegations regarding specific actions taken or statements made by Zyskind in his capacity as an officer during the

---

[123] Compl. ¶ 457.

[124] K-Z Family Opening Br. ¶ 14.

negotiations. When the Complaint specifically mentions Zyskind, it does so in his capacity as a director of AmTrust. Plaintiffs did not address this deficiency in their brief or at oral argument, and thus waived the issue.[125] Accordingly, the court will grant the motion to dismiss Count II. Zyskind, of course, will remain in the case as a defendant for purposes of Counts I and III in his capacity as a director of the Company and part of its control group.

### D.    The Aiding and Abetting Claim Against the Stone Point Defendants

Count IV of the Complaint asserts that the Stone Point Defendants "aided and abetted the Director Defendants and Zyskind as an officer defendant, in the aforesaid breach of their fiduciary duties."[126] The elements of a claim for aiding and abetting a breach of fiduciary duty are: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."[127] "An aider and abettor knowingly participates in a breach when it acts with the knowledge that the conduct advocated or assisted constitutes such a breach."[128]

---

[125] *See Emerald P'rs*, 726 A.2d at 1224 ("Issues not briefed are deemed waived.") (citations omitted).

[126] Compl. ¶¶ 475-78.

[127] *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 750 (Del. Ch. 2016), *aff'd*, 156 A.3d 697 (Del. 2017).

[128] *Chester Cty. Emps.' Ret. Fund v. KCG Holdings, Inc.*, 2019 WL 2564093, at *18 (Del. Ch. June 21, 2019) (internal citations omitted).

36

For the reasons discussed above, Plaintiffs have satisfied the first two elements of an aiding and abetting claim by successfully pleading claims for breach of fiduciary duty against three of the four members of the Special Committee and against the three members of the K-Z Family as directors of the Company. Plaintiffs advance essentially two arguments in an effort to satisfy the element of knowing participation, but both fail to plead facts demonstrating that the Stone Point Defendants *knew* that their conduct advocated for or assisted in a breach of fiduciary duty by any of the individual defendants.

First, Plaintiffs contend that the Stone Point Defendants "knew the members of the Special Committee were not independent and disinterested."[129] In support of this contention, Plaintiffs assert that it was widely known that "[t]he *chairperson* of the Special Committee (DeCarlo) was a longtime friend, lawyer, business associate and ally of the Karfunkel-Zyskind Family."[130] Plaintiffs also assert that "Stone Point had to have been aware of the Cambridge Derivative Action and the Accounting Derivative Action," that these actions "undoubtedly would have been analyzed as part of Stone Point's due diligence," and thus Stone Point must have known "it was not paying value for [those derivative actions] despite 'deeply troubling' conduct

---

[129] Pls.' Answering Br. 90.

[130] *Id.* 90-91 (citing Compl. ¶ 375).

observed by this Court."[131] The Complaint, however, fails to allege facts sufficient to support these assertions such that it would be reasonable to infer that the Stone Defendants "knowingly participated" in a breach of fiduciary duty.

Plaintiffs ask the court to infer that Stone Point Defendants knew DeCarlo would not consider the merits of the Transaction independently based on a single allegation in the Complaint. The relevant allegation is that ISS reported three months after the Transaction was announced that "DeCarlo 'has served since 2006 as an AmTrust director and since 2010 as a director of [NGHC], an insurance company where Zyskind has been a director since 2013 and whose CEO Barry Karfunkel.'"[132] This allegation of board service on the AmTrust Board and one other company controlled by the K-Z Family, without more, is insufficient to support a reasonable inference that DeCarlo did not have the independence to serve on the Special Committee.[133] Plaintiffs' assertions that the Stone Point Defendants must have known members of the Special Committee were interested in the Transaction

---

[131] *Id.* 91.

[132] *Id.* 91 n.298 (citing Compl. ¶ 375). "NGHC" refers to National General Holdings Corp., an entity the K-Z Family controlled that played a role in the transaction involving Tower Group International, Ltd., which was the subject of the Cambridge Action. Compl. ¶ 17.

[133] *See In re BGC P'rs, Inc.*, 2019 WL 4745121, at *7-8 (Sept. 30, 2019) (Although "our law is not blind to the practical realities of serving as a director of a corporation with a controlling stockholder," this allegation alone is insufficient to establish a lack of independence from the controller.).

due to the Cambridge Action are not only speculative as stated in their brief, they are unsupported by any citations to the Complaint and thus are conclusory.[134]

Second, Plaintiffs argue that the court should infer that the Stone Point Defendants acted with scienter because they and the K-Z Family met privately with A.M. Best and later explained to the Special Committee their "views on the Company's financial position and the effect that the going private transaction could have on the Company's rating by A.M. Best Company."[135] The flaw in this theory is that Plaintiffs do not explain why it would be reasonable to infer that the MBO Group's alleged discussions with the Special Committee about the potential impact a transaction would have on its rating by A.M. Best—which had placed AmTrust "under review with negative implications" months earlier[136]—amounted to anything other than arm's-length negotiations.[137]

---

[134] *See* Pls.' Answering Br. 91. As discussed above, the Complaint pleads a reasonably conceivable set of facts that three of the four members of the Special Committee had a material self-interest in the Transaction. *See* Part III.A. With respect to the aiding and abetting claim, however, the critical failure of the Complaint is the lack of any factual allegations supporting a reasonable inference that the Stone Point Defendants knew about and exploited this conflict of interest in its dealings with the Special Committee.

[135] *Id.* 92-93 (citing Compl. ¶ 289).

[136] Compl. ¶ 215 ("On November 9, 2017, A.M. Best announced that AmTrust was 'under review with negative implications.'").

[137] *Morgan v. Cash*, 2010 WL 2803746, at *8 (Del. Ch. July 16, 2010) ("[A]rm's-length bargaining is privileged and does not, absent actual collusion and facilitation of fiduciary wrongdoing, constitute aiding and abetting.").

39

In sum, Plaintiffs have failed to plead facts sufficient to support a reasonable inference that the Stone Point Defendants knowingly participated in a breach of fiduciary duty by the members of the Special Committee or the K-Z Family. Accordingly, the court will grant the motion to dismiss Count IV.

## IV. CONCLUSION

For the reasons explained above, the court grants in part, and denies in part, the Defendants' motions to dismiss the Complaint. The parties should confer and submit an order implementing this decision within five business days.